Marvin MAKOFSKY, Plaintiff,

v.

ULTRA DYNAMICS CORPORATION and Avis Industrial Corporation, Defendants.

No. 70 Civ. 3679.

United States District Court, S. D. New York.

Oct. 16, 1974.

---

Garwin & Bronzaft, New York City, for plaintiff.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for defendants; Geoffrey M. Kalmus, Michael S. Oberman, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

This suit under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), is brought to recover short-swing profits allegedly realized by Ultra Dynamics Corp. (Ultra), in the sale of stock of Avis Industrial Corp. (Avis). The complaint is brought derivatively by an Avis shareholder. Makofsky alleges, and Ultra does not dispute, that Ultra acquired 49,744 shares of Avis Common Stock for $12. per share on September 30, 1969 and sold them at a substantial profit[1] on November 13,

---

1. The parties dispute the amount of Ultra's profit; however the precise amount is unim- portant because each side moves for summary judgment solely on the issue of liability.

1969. Both sides move for summary judgment on the issue of liability.

## I.

### A. Ultra's High Hopes.

The material facts are not disputed, but they are complex. In late 1968, Ultra's corporate desires settled on the acquisition of control of Avis, whose shares were traded on the American Stock Exchange. Negotiations between Ultra and Avis resulted, on January 16, 1969, in the execution of two agreements cumulatively providing for the acquisition by Ultra of 51% of Avis' stock. One agreement, with Avis itself, provided for the purchase of 49,744 shares of its treasury stock for $596,928. Simultaneous with the execution of this agreement, Ultra placed two designees on the Avis Board. The second agreement, between Ultra and Warren E. Avis, controlling shareholder of Avis, provided for the purchase in two blocks of his entire holdings of Avis stock (some 261,000 shares) for an aggregate sum of $4,000,000; but without further memberships on the Avis board.

The only money which changed hands at the time the agreements were executed was $100,000. paid by Ultra to Avis on account of the purchase of treasury shares. The balance due Avis was paid some five weeks later. Warren Avis received no money at the time the agreements were executed because Ultra did not then have the cash to pay him. In order to raise the necessary funds, Ultra planned a major public offering of its own stock for the Spring of 1969. Weis, Voisin, Cannon, Inc. (WVC), several of whose officers had substantial investments in Ultra, was to manage the underwriting. .

The transaction with Warren Avis was structured to coincide with these plans. By the January 16, 1969 agreement, Ultra agreed to purchase from Warren Avis 211,770 Avis shares for $3,403,072. or $16.06 per share. The closing was to take place on June 30, 1969, to give Ultra time to raise the necessary funds through the sale of its own securities. If the closing of the purchase of the 211,770 shares was completed as agreed, Ultra would have an option to purchase from Warren Avis his remaining 49,744 Avis shares for $596,928, or $12. per share. The option granted by Mr. Avis was exercisable until September 30, 1969, but was conditioned on Ultra's prior payment in full for the 211,770 share block. In the meantime, Mr. Avis' attorney was to hold as security the Avis treasury shares purchased by Ultra from Avis. If Ultra failed to pay the $3,403,072 on June 30th the treasury shares would be forfeited as liquidated damages.

### B. Clouds Threaten the Corporate Rendezvous.

As this scenario indicates, Ultra's successful acquisition of control of Avis through the agreements described was heavily contingent on the consummation of Ultra's public offering of its own stock and warrants. Soon after the execution of the Avis agreements, therefore, Ultra and WVC turned their attention to preparation of the offering. They planned, naturally, to file the registration statement in time for it to become effective prior to the scheduled closing with Warren Avis on June 30th.

Almost from the start, however, their intentions were frustrated. Preparation of the registration statement took longer than expected, and the new issue market was so active at the time that the SEC was considerably back-logged. Ultra did not receive the SEC's letter of comment until late June, 1969. To make matters worse, the price of Ultra's stock on the over-the-counter market began to sag in the second quarter of 1969.

This combination of circumstances made a pre-June 30th public offering impossible as a practical matter, and WVC was reluctant to bring Ultra's new issue to market during the traditionally slow and risky summer season in the securities markets. Ultra consequently found itself confronted with two unpalatable choices. First, it could permit Mr.

Avis to take as liquidated damages its $596,000 investment in Avis treasury shares. This course would seriously jolt Ultra's already shaky financial position, since at the time Ultra's net worth was only $400,000 and its current assets were composed almost entirely of inventory and accounts receivable. Ultra's second choice, the one it made, was to seek modification of its agreement with Warren Avis.

Mr. Avis was, in the circumstances, in the stronger bargaining position. On July 2nd and July 11th, Ultra and Mr. Avis executed modifications of their original agreement. The modifications provided for payment by Ultra of $750,000 by July 14, 1969 on account of the $3,403,072 which had been due on June 30th, plus interest at 1% per month on the unpaid balance. Additional security arrangements in Mr. Avis' favor provided that on Ultra's further default, he would be entitled to keep the $550,000 payment Ultra made on July 2nd, in addition to the treasury shares already pledged.

With disaster averted for the moment, Ultra again turned its attention to the registration of its public offering rescheduled for September 2, 1969. However, as the scheduled date drew near, WVC again decided the time was not propitious for the offering, and after giving assurances to Ultra that it would ultimately proceed, fixed October 16 for the new effective date. This turn of events naturally required Ultra to return to Mr. Avis, hat-in-hand, to request a further extension of time to perform under the purchase agreement. The only alternative was default with even less appetizing consequences than would have prevailed earlier. By September, 1969, Ultra had over $1,000,000 tied up in Avis stock which would be forfeited under the terms of the agreement as modified in July. Such a loss would almost surely have driven Ultra into bankruptcy.

On September 2nd and September 16th, the agreement between the parties was amended once again. Ultra paid Mr. Avis an additional $250,000, (the proceeds of a personal loan from Ultra's Chairman), and promised an additional $750,000 by October 24, 1969. The closing date for final payment was adjourned to December 2, 1969. Ultra's option to purchase an additional 49,744 shares, which was to have expired September 30th under the original agreement, was modified so that its exercise was conditioned upon the payment of only the $750,000 due on October 24th, rather than the full purchase price. Although Ultra still had to exercise the option by Septemer 30th, it no longer had to tender payment for the option shares at the time of exercise. Instead, payment for these shares, as well as the balance due (after the October 24th payment) of $1,653,072 on the 211,770 share block, and interest on both blocks, was to be made at the December 2, 1969 closing.

On WVC's reassurance that the Ultra public offering would finally go forward as scheduled in mid-October, Ultra exercised its option for the 49,744 block on September 30th. On October 14th, the registration statement was complete, except for the insertion of the "pricing amendment" and other customary last-minute changes. On October 16th, Ultra and its lawyers and accountants assembled at WVC's offices to attend to these details and sign the underwriting agreement. Instead, WVC informed Ultra that several participants in the underwriting syndicate were withdrawing and that consequently WVC was withdrawing also. The offering did not go forward.

## C. Ultra Makes the Best of a Bad Situation.

Spurned by its underwriters, Ultra found no solace with Mr. Avis either. He refused further accomodations to Ultra, and notified it that he intended to foreclose on the Avis stock pledged as security.

To forestall the threat of bankruptcy, Ultra's management sought a buyer for the Avis shares it could not pay for.

Early in November, an intermediary introduced Ultra to Bradford Speed Packaging & Development Co. (Bradford) which was interested only if it could acquire all the Avis shares held by Ultra, including the option shares it had just agreed to purchase on September 30th. Following Ultra's initial discussions with Bradford, Warren Avis and his attorney were introduced to Bradford representatives. Of course, because of Ultra's defaults, any agreement it made with Bradford had to meet Mr. Avis' approval. Counsel for Bradford and Avis engaged in direct negotiations, in which Ultra played a comparatively minor part. The resulting transaction involved an exchange of all Ultra's Avis shares (311,258), for 222,222 shares of a new class of Bradford Common Stock valued at $22.50 per share.[2] For Ultra this was the equivalent of about $16. per Avis share. (311,258 x $16. = 222,222 x $22.50.)

There remained for negotiation the terms on which Ultra would receive a portion of the Bradford stock, (representing a credit for the approximately $1,000,000 it had already paid Mr. Avis). Under the contract as modified, Ultra owed Mr. Avis just under $3,000,000. Consequently most of the Bradford shares received by Ultra would go to Mr. Avis in return for a general release.

However, Mr. Avis took the position that he should receive a premium in view of Ultra's defaults, his cooperation in arranging the deal with Bradford, and the favorable bargain Ultra had made in purchasing the option shares for only $12. per share. Otherwise, Ultra would gain a windfall of about $200,000 on the option shares ($12. exercise price as against an average sale price of about $16. received from Bradford for Avis shares multiplied by 49,744 shares). Accordingly, the agreements with Bradford executed on November 13, 1969, provided for the receipt by Mr. Avis of $3,150,000 in Bradford stock rather than $3,000,000. In addition, Ultra was to required to pay the finder's fee of 5,000 Bradford shares (valued at about $110,000) incurred in arranging the transaction.

To summarize, Ultra made three purchases of Avis stock during 1969: the initial purchase of 49,744 treasury shares from Avis in January, 1969 was made more than six months prior to the November 1969 sale; the second purchase in July, 1969 of the 211,000 share block at $16. per share resulted in no profit to Ultra at the time of sale in November, 1969. Neither of these purchases and sales are claimed to violate § 16(b). The third purchase was made in September, 1969, on the exercise of Ultra's option for 49,744 shares at $12. per share. These shares were sold, together with the two previous blocks, pursuant to Ultra's agreement with Bradford in November, 1969 by which Ultra received an average price for *all* its Avis shares of about $16. Makofsky sues to recover only on this third purchase, alleging a short-swing profit of about $4. per share, or roughly $200,000.

## II.

### Applicable Legal Principles

The purpose of § 16(b), as stated in the language of the statute, is to prevent "the unfair use of information which may have been obtained by [a corporate officer, director of 10% stockholder] reason of his relationship to the issuer," and to that end, the statute requires that an insider surrender to the issuer "any profit realized by him from any purchase and sale . . . of any equity security of such issuer . . . within any period of less than six months." § 3(a)(14) of the Act, 15 U.S.C. § 78c(a)(14), broadly defines the term "sale" to include "any contract to sell or otherwise dispose of" a security. If these elements are present, liability is imposed "irrespective of any

2. The parties dispute the exact value of the Bradford shares, because they were unregistered at the time of the exchange.

intention on the part of such [insider] in entering into such transaction of holding the security purchased . . . for a period exceeding six months," even "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 1745, 36 L.Ed.2d 503 (1973). In view of the fact that § 16(b) was intended to be a "relatively arbitrary rule capable of easy administration," Bershad v. McDonough, 428 F. 2d 693, 696 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), the courts have construed the statute in a way that will, so far as possible, preserve its "mechanical quality." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 425, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). As the court observed in Blau v. Lamb, 363 F. 2d 507, 516 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967) "[i]t might be said that Congress decided in order to throw out the bathwater that the baby had to go too." See also Newmark v. RKO General, Inc., 425 F.2d 348, 350–351 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). Although the predisposition to throw out babies was especially evident in early cases construing § 16(b), Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), Magida v. Continental Can Co., 231 F.2d 843 (2d Cir.), cert. denied, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956), Park & Tilford Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947), the strict, "objective" standard embodied in the statute is still the law as to "garden variety" insider transactions. Schur v. Salzman, 365 F.Supp. 725 (S.D.N.Y.1973), Morales v. Arlen Realty & Development Corp., 352 F. Supp. 941 (S.D.N.Y.1973). However, when confronted with borderline or "unorthodox" transactions not clearly within the statutory language or stated purpose, the Supreme Court and this Circuit have taken a more "pragmatic approach." This approach involves the analysis on a case by case basis "whether the [unorthodox] transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information. . . ." Kern County Land Co. v. Occidental Petroleum Corp., supra, 411 U.S. at 594, 93 S.Ct. at 1744. See also, Blau v. Lamb, supra, 363 F.2d at 516, Reliance Electric Co. v. Emerson Electric Co., supra, 404 U.S. at 424, n. 4, 92 S.Ct. 596.

■ We have little difficulty with the threshold question whether this is a "garden variety" § 16(b) suit or one involving an "unorthodox" transaction. The relevant authorities indicate that § 16(b) claims, such as the one at hand, in the context of tender offers, mergers, exchanges of securities and other corporate reorganizations are not suited to mechanical application of the statute. Kern County Land Co. v. Occidental Petroleum Corp., supra; Newmark v. RKO General, Inc., supra; Blau v. Lamb, supra; American Standard, Inc. v. Crane Co., 346 F.Supp. 1153 (S.D.N.Y.1972). Moreover, in view of the fact that Ultra has raised novel questions as to the construction of the Occidental case, Makofsky's argument that we should look only to the bare elements of the purchase and sale of the option shares is unpersuasive. Accordingly, our inquiry focuses on the question whether Ultra's purchase and sale of the option shares violates the spirit of § 16(b), as well as the letter.

### III.

■■ Not surprisingly, none of the cases construing § 16(b) have involved the complex and unique factual pattern presented here. However, the cases suggest our general approach. In recognizing a limited class of unorthodox transactions whose § 16(b) liability is determined by a pragmatic rather than purely mechanical approach, the courts have not tossed aside the deterrent policy un-

derlying § 16(b). Accordingly, the principal inquiry in a pragmatic analysis is whether the transaction in issue could *possibly* tend to accomplish the practices § 16(b) was designed to prevent. Blau v. Lamb, *supra,* 363 F.2d at 519. The indices of such a possibility are access to inside information (as distinguished from posssion of it), and the ability to influence the timing and circumstances of the transaction in issue. Kern County Land Co. v. Occidental Petroleum Corp., *supra,* 411 U.S. at 597–600, 93 S.Ct. 1736; Newmark v. RKO General, Inc., *supra,* 425 F.2d at 353–354; American Standard, Inc. v. Crane Co., *supra,* 346 F.Supp. at 1160–1161; Blau v. Lamb, 363 F.2d at 521–522. As the court observed in Bershad v. McDonough, *supra,* 428 F.2d at 696:

> "The thrust of the statutory scheme thus placed responsibility for meticulous observance of the provision upon the shoulders of the insider. He was deemed capable of structuring his dealings to avoid any possibility of taint *and therefore must bear the risks of any inadvertent miscalculation."* (emphasis supplied)

Accordingly, as in "garden-variety" cases, proof of innocent motive or intent, or lack of the actual use of inside information is irrelevant. Newmark v. RKO General Inc., *supra,* 425 F.2d at 353; the ban of the statute attaches whether or not the defendant himself is even aware of the possibility of speculative abuse.

### IV.

■ Ultra seeks to avoid the dragnet sweep of the statute by arguing that the purchase and sale of the option shares cannot be viewed as an isolated transaction for purposes of § 16(b). It claims that the disastrous course of events which resulted in the ultimate short-swing profit can be realistically viewed only as an abortive attempt at a unified transaction: the acquisition of control over Avis. Consequently, the argument goes, the sale of the option shares was necessitated by forces completely beyond Ultra's control: the vagaries of the new issue market, WVC's withdrawal and, of course, the insistent presence of Warren Avis. Ultra contends that these facts make clear that November 16th sale of the option shares was a "forced" sale, cf. Ferraiolo v. Newman, 259 F.2d 342, 346 (6th Cir. 1958), Kern County Land Co. v. Occidental Petroleum Corp., *supra,* 411 U.S. at 600, 93 S.Ct. 1736, free from the opportunity for speculative abuse. Moreover, if Ultra's three purchases and sales of Avis stock were regarded as a unified transaction, there would be no § 16(b) liability, because Ultra sustained an overall loss in its misadventures in Avis stock.

■ At first blush, Ultra's line of argument has considerable attraction, but its implicit appeal to the equities of the situation must yield to the explicitly harsh policy of § 16(b). Although for some purposes it may be fruitful to regard Ultra's dealings in Avis stock as a unified acquisition plan, it is clear that for purposes of the proper application of the statute the purchase and sale of the option shares were distinct commercial transactions. It is beyond dispute that Ultra was under no legal obligation whatever to purchase the option shares, on September 30 or at any other time; the only economic link between the purchase of the option shares and the purchase of the two earlier blocks was that Ultra was obligated to make certain payments on the 211,000 share block in accordance with its amended agreement with Warren Avis as a condition precedent to exercise of the option. Moreover, in view of the well-settled rule that the policy of § 16(b) is best served by prohibiting the offsetting or averaging of profits and losses in multiple short-swing trades, Ultra's argument fails as a matter of law. Smolowe v. Delendo, *supra,* 136 F.2d at 239; Gratz v. Claughton, 187 F.2d 46 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951); Adler v. Klawans, 267 F.2d 840 (2d Cir. 1959). These cases stand for the proposition that in cases involving multiple short-

swing trades, the transaction with the lowest purchase price is to be matched with that having the highest sale price for purposes of determining § 16(b) profits, regardless of whether the insider's trading, in the aggregate, netted him a profit or loss.

## V.

We turn to the narrow issue whether there inhered in the purchase and sale of the option shares the opportunity for speculative abuse. Ultra relies principally on *Kern County Land Co., supra.* In that case Occidental made a tender offer to shareholders of Old Kern whose management vigorously resisted Occidental's overtures and arranged a defensive merger with Tenneco. When Occidental saw that the Tenneco merger might be approved, locking Occidental into a minority position in Old Kern's putative successor, it entered into an agreement with Tenneco whereby Tenneco was given the option to purchase all of the Tenneco stock to which Occidental would be entitled if and when the Old Kern-Tenneco merger was consummated. The merger was consummated about three months later entitling Occidental, as the holder of some 900,000 shares of Old Kern stock to a like number of Tenneco preference shares. Within six months of the merger Tenneco exercised its option, ostensibly making Occidental a § 16(b) seller, with a profit of some $19.5 million.

The complaint alleged both that Occidental's mere *grant* of an option to Tenneco was a § 16(b) "sale" of the Old Kern stock it had acquired less than six months previously; and that Occidental both "purchased" (pursuant to the Old Kern-Tenneco exchange) Tenneco preference shares and sold them when Tenneco ˙ exercised its option within six months after Occidental acquired them.

In affirming the Second Circuit's dismissal of the complaint, the Court held that neither transaction could have served as the vehicle for the "realization of short-swing profits *based upon access* to inside information." (emphasis supplied) 411 U.S. at 594, 93 S.Ct. at 1744; *Blau v. Lamb, supra.* The Court stressed that Occidental at no time had access to inside information of Old Kern's affairs: Old Kern's management from the start of Occidental's overtures opposed the tender offer and in fact frustrated Occidental's efforts to inspect its shareholder lists. As to the events leading to the exchange of Occidental's Old Kern stock for Tenneco stock, the Court emphasized the "critical fact" that the exchange took place and was required pursuant to the Old Kern-Tenneco merger, which Occidental did not influence either as a negotiator or even as a voting Old Kern shareholder. Once the merger and exchange were approved, the Court observed, Occidental was left with "no real choice with respect to the future of its shares of Old Kern," 411 U.S. at 600, 93 S.Ct. at 1747, apart from the sale of the stock prior to the merger's approval—a course sure to result in § 16(b) liability. Accordingly, the Court concluded that "the involuntary nature of Occidental's exchange, *when coupled with* the absence of the possibility of speculative abuse of inside information," 411 U.S. at 600, 93 S.Ct. at 1747 (emphasis supplied) made § 16(b) inapplicable to Occidental's "purchase" and "sale" of the Tenneco preference share.

The Court also concluded that the option agreement, which was claimed to constitute a "sale" to Tenneco of Occidental's Old Kern shares, was neither a "sale" nor an instrument with potential for speculative abuse: The fact that Occidental had no choice but to sell at the stipulated price if Tenneco exercised its option removed any possibility that Occidental could speculate on the price of Tenneco shares rising in the interim. 411 U.S. at 602, 93 S.Ct. 1736.

■ Notwithstanding Ultra's attempt to analogize itself to Occidental, *Kern County Land Co.* is not dispositive of the present case. There the Court stressed that although Occidental was a statutory insider by virtue of its substantial stock ownership, it in fact had

*no access to* inside information about Old Kern. 411 U.S. at 598, 93 S.Ct. 1736. Ultra, however, was an insider not only because of its substantial stock ownership of Avis, but also because it placed two designees on the seven man Avis board and on the four man Avis Executive Committee at the time of its initial 49,000 share purchase of Avis treasury stock in January, 1969, nearly a year before the challenged sale. The June 30th letter to shareholders of Avis corporation states: "The management assistance of the directors elected to the board representing Ultra Dynamics Corp. during the past few months has been a constructive contribution to your company." (Exhibit S to Garwin Affidavit, May 29, 1974). Ultra claims that these members were neither active in the management of Avis nor possessed inside information about Avis. However, it adduces no facts tending to show it had no *access* to such information, which is the test. Kern County Land Co., 411 U.S. at pp. 596–597, 93 S.Ct. 1736. Compare Gold v. Sloan, 486 F.2d 340 (4th Cir. 1973).

■■■■■ Makofsky is correct that the knowledge of Ultra's designees about Avis (or their access to such knowledge) is imputed to Ultra as a matter of law, see Feder v. Martin Marietta Corp., 406 F.2d 260 (2d Cir.) cert. denied 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1969); Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962, 967 (S.D.N.Y.1965); Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). However, we do not agree with the next step in Makofsky's argument: that a bare showing of access to inside information establishes as a matter of law the possibility of speculative abuse. As we read *Kern County Land Co.*, the fact that Occidental had no such access was merely *evidence* tending to negate the possibility of speculative abuse. Nevertheless, the Court did not hold that access to, or even the possession of, inside information *compels* the finding of a possibility of such abuse in "unorthodox" transactions. Indeed, well before

the decision in *Kern County Land Co.*, the authorities had rejected that proposition even where the insider was a controlling shareholder, officer and director. Blau v. Lamb, *supra*, 363 F.2d at pp. 519–521 (2d Cir. 1966). See, also, Newmark v. RKO General, Inc., *supra*, 425 F.2d at 353–354; American Standard Inc. v. Crane Co., *supra*, 346 F.Supp. at 1158–1159.

■■■■ Instead, the relevant question is whether Ultra had *both* access to inside information *and* some measure of influence over the timing and circumstances of the transaction sufficient to give it the possibility of profits *based on* inside information. *Kern County Land Co., supra*, 411 U.S. at 597–600, 93 S.Ct. 1736. We turn to the second branch of that question.

It is clear that from the start of its pursuit of Avis, Ultra over-extended itself financially. In doing so it placed itself at the mercy of both WVC, who was to supply Ultra's bootstraps, and Warren Avis, who in these circumstances had much the better cobbler. Nor do we question Ultra's good faith beliefs that its public offering would finally go forward, on October 16, 1969; that it could pay Warren Avis and acquire control of Avis; and that it would retain its Avis shares indefinitely. But the authorities make clear that such considerations are irrelevant if there was in the structure of the purchase and sale of the option shares the possibility of an improper short-swing profit. For the reasons stated below, we find that Ultra had sufficient control over the purchase and sale of the option shares to afford it such a possibility.

## VI.

To begin with, it must be stressed again that Ultra was under no obligation to purchase the option shares at all. Ultra argues that it was forced to do so as a practical matter in order to assure itself of majority ownership of Avis and to insure that Ultra would not be deemed an investment company under

the Investment Company Act of 1940 by reason of its minority position in Avis.[3] However, these arguments are unpersuasive. If majority ownership was so critical at the time Ultra exercised the option in September, 1969, it was equally critical in January, 1969, when Ultra settled for an option (as opposed to an outright purchase) on the necessary 49,000 shares.

Somewhat inconsistently, Ultra also argues that the facts clearly establish that it would not have exercised the option (incurring substantial financial commitment) if it doubted for a moment the success of the October 16th offering. It points out that its own officers had loaned money to the corporation to meet its obligations to Mr. Avis, a step they would never have taken without WVC's assurances of its commitment to the agreed schedule. But these arguments are addressed to the question of Ultra's "investment" intent and good faith which is, as noted above, irrelevant to the possibility of speculative abuse.

More important for our purposes, Ultra's good faith intent is not inconsistent with the possibility that it carefully weighed the varied potential consequences of its exercise of the option, particularly in view of its precarious financial position. It is significant that Ultra had every reason to take into account at least the possibility of failure of its public offering: it of course knew that WVC was not legally committed to manage the offering. It also knew, following two false starts, that entry into the new-issue market was an uncertain proposition. Moreover, its own financial condition deteriorated substantially during the pendency of its plans for an offering, making its success more doubtful. In these unpropitious circumstances, ordinary business judgment would suggest the careful evaluation of

the pros and cons of exercising the option.

Ultra may well have concluded it could not lose by exercising. It is undisputed that Avis was in a sharp earnings uptrend throughout 1969. From an operating loss of over $800,000 in 1968, Avis' pre-tax earnings increased to $623,000 for the six months ended June 30, 1969 and to $1,079,079 for the year ended December 31, 1969. As an Avis insider, Ultra was classically positioned, at the time it exercised the option, to weigh the opportunity of a $12. option price against the possibility that the market price of Avis' shares would either rise or fall over the near term. If its information indicated it might be able to buy Avis shares on the market at a lower price soon after September 30th, (the exercise date) it might not have exercised; in this case, however, Avis shares may have seemed a safe buy at $12. whatever the outcome of Ultra's offering, in view of its earnings trend, which Ultra was well-situated to judge.

Ultra cites the *Occidental* case for the proposition that calculations of this sort are outside the purview of § 16(b). However, its reliance is misplaced. There the Court noted that Occidental might have reasoned that its takeover would either succeed or be met by a defensive merger resulting in a higher price for the Old Kern shares Occidental had already acquired. The Court observed, however, that such predictions "could not have been based on inside information obtained from substantial stockholdings that did not yet exist." 411 U.S. 597, 93 S.Ct. 1746. In other words, Occidental had only the general *"public"* knowledge that its tender offer would either succeed or be met with a defensive merger; in contrast, Ultra had access to inside, *non-public* information about Avis' future earnings.

3. The Investment Companies and Advisers Act, 15 U.S.C. § 80a–1 et seq., imposes certain requirements on issuers primarily engaged in the business of investing, trading, or holding securities having a value exceeding 40% of the issuer's total assets. Securities issued by *majority-owned* subsidiaries of the owner (Ultra here) are excepted. See 15 U.S.C. § 80a–3.

Ultra's exercise of the option offered several possible benefits in addition to the possibility of a "garden variety" profit: First, if Ultra's own acquisition plan failed, its ownership of the additional 49,000 shares would enable it to sell clear control (51%) of Avis to a third party, rather than the 43% it had before September 30. Second, this ownership would give Ultra the possibility of a "control premium" which might partially offset a future price decline of Avis shares on the market; Third, knowledge of Avis' escalating earnings might have suggested to Ultra that even if its offering fell through it could sell *some* Avis shares immediately in order to pay Mr. Avis, and retain a substantial block on which it could make a profit. In short, by exercising the option Ultra either could solidify its position of control of Avis, or considerably soften any financial injury resulting from the failure of its acquisition plans.

Of course, the factors just described are relevant to the possibility of speculative abuse only if they resulted in a sale within six months. The possibility of such a sale was foreseeable by Ultra because it had every reason to believe that Warren Avis would not tolerate an additional delay. Ultra's response to this is that any calculations it may have made on the basis of inside information are irrelevant: it never had the opportunity to *use* such information because its short-swing sale was a forced sale which would have come about irrespective of access to inside information.

Apart from the special circumstances presented in *Occidental*, the "forced seller" defense has been consistently rejected by the authorities. Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736 (8th Cir. 1965) (§ 16(b) profits recoverable where sale was required by an anti-trust decree); American Standard, Inc. v. Crane Co., *supra*, 346 F. Supp. at 1163–1164. Closely in point is Alloys Unlimited Inc. v. Gilbert, 319 F. Supp. 617 (S.D.N.Y.1970). There Judge Mansfield held that a § 16(b) recovery

was proper even though the sale of pledged securities was not made by their owner, but by the bank-pledgee. In rejecting a "forced seller" claim, the court noted that a trader could not only foresee the possibility that the collateral could be sold by the pledgee, but also that such a sale could be deliberately brought about by defaulting on the underlying loan. Those observations are apt in the present case. If, for example, Mr. Avis had sold the Avis stock he held as collateral for Ultra's loans, *Alloys Unlimited* might be neatly dispositive here. Similarly, if Avis were indebted to a third party not connected to its acquisition of Avis, and were forced to sell its Avis shares within six months in order to satisfy that obligation, § 16(b) liability would clearly result, even though the shares were purchased pursuant to a plan of acquisition.

In our view, the *Occidental* case, on which Ultra relies, did not repudiate the rule earlier announced in *Alloys Unlimited*. In holding that Occidental's sale of Old Kern stock was "involuntary," it noted that Occidental not only had no access to inside information but also had absolutely no control over or participation in, the timing and circumstances of the Tenneco-Old Kern merger, 411 U.S. at 599, 93 S.Ct. 1736. Ultra's control over the circumstances of the sale of its Avis stock were, of course, seriously restricted, but the record does not support the view that it had no voice whatever. First, as noted above, Ultra could at the time of purchase have foreseen that such a sale might become necessary, a factor recognized as significant in *Alloys Unlimited, supra,* 319 F.Supp. at 619. Second, as noted in American Standard Inc. v. Crane, Co., *supra,* 346 F.Supp. at 1163, if causation (i.e. the "force" that compels the sale) is measured, as it traditionally is, by a "but for" test, it cannot be said that "but for" the failure of Ultra's offering, the short-swing sale would not have taken place. Like the defendant in *Alloys Unlimited,* Ultra might have chosen to de-

fault on its payments to Warren Avis or to sell its stock to a third party if its information indicated a future price decline in Avis stock. In such circumstances it might have made a substantial overall profit in Avis shares (or averted a large loss) even after surrendering any profit on the option shares. Third, unlike the seller in *Occidental,* Ultra did retain *some* control over the circumstances of the sale. It was responsible for finding a buyer for its Avis shares, for initiating negotiations with it, and at least suggesting the terms of the sale. It is possible, for example, that Ultra could have persuaded other buyers (or even Bradford itself) to purchase outright only enough shares for Ultra to pay Warren Avis, and take an option to purchase the balance after six months. This would have satisfied Bradford's desire for complete control and reduced, if not eliminated, Ultra's § 16(b) profit.

We conclude that Ultra's "forced sale" was of a different quality than Occidental's, both because it put its own head in the lion's mouth, and because it retained at lease some power to get out of it. To the extent that Ultra's sale of Avis shares was involuntary, it was in no different a position than any short-term holder of securities who needs cash quickly: the "buyer" always has more control over the timing and circumstances of the sale than the seller. Although Ultra actually lost money in Avis stock overall, the consequences of immunizing it from § 16(b) liability would be to carve out of the statute an exception for insiders who enter into improvident transactions. No case has gone so far, and because such an exception would run counter to the clear policy of the statute, we decline to do so. Plaintiff's motion for summary judgment is granted; defendant's motion is denied.

It is so ordered.