**PIER 1 IMPORTS OF GEORGIA, INC., Plaintiff,**

**v.**

**Rayland O. WILSON, Defendant,**

**v.**

**Luther HENDERSON & Pirvest, Inc., et al.,**

**v.**

**Harry LEWIS, Plaintiff,**

**v.**

**Rayland O. WILSON and Pirvest, Inc., Defendants.**

**Civ. A. No. CA–3–80–0422–D (Consolidated).**

United States District Court, N. D. Texas, Dallas Division.

Dec. 15, 1981.

Ronald E. Holub, Dallas, Tex., for Pier I Imports.

Robert T. Mowrey, Dallas, Tex., for Wilson.

## MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

Came on for consideration this action brought by Plaintiff Harry Lewis (Lewis) against Defendant Rayland O. Wilson (Wilson) for the recovery of short-swing profits allegedly obtained in violation of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Lewis is a shareholder of Pirvest, Inc., (Pirvest) and filed this suit on its behalf. Wilson does not deny that he profited from his purchase and sale of common stock within the statutory six month period, but contends that his

actions fall within an exception to the strict liability imposed under Section 16(b). A hearing on the parties' cross motions for summary judgment and a trial on the merits were held. As a result, the parties have entered into stipulations on all relevant questions of fact. The question before the Court is whether the defense to Section 16(b) liability created by the Supreme Court in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), is applicable to the transaction in question. The Court is of the opinion that the *Kern County* defense is applicable and that Wilson need not disgorge the short-swing profits he realized.

### Findings of Fact

While Plaintiff has preserved his objections to many of the stipulated facts on grounds of materiality and relevance, the following facts are uncontested. Wilson served as the executive vice-president of Pier I. Imports of Georgia, Inc., (Pier I), the predecessor of Pirvest, from October 2, 1978 until he was terminated on November 30, 1979. For purposes of simplification, Pier I hereinafter will be referred to as Pirvest. Pirvest's shares of common stock were registered with the Securities Exchange Commission (SEC) throughout this period, and Wilson purchased his last share of Pirvest stock on August 1, 1979. During this period, Pirvest was a specialty retailer operating over 300 retail import stores throughout the United States and Canada.

In late August or early September of 1979, Pirvest entered into negotiations with Pier I. Acquisition, Inc., (Acquisition) in which Acquisition offered to purchase Pirvest's outstanding common stock. This purchase offer was made on behalf of Acquisition's parent, Newcorp., Inc., (Newcorp) through Newcorp's acquisition agent, Fuqua Industries, Inc. (Fuqua). Luther Henderson (Henderson), the president of Pirvest, was the only person with whom Fuqua negotiated concerning the acquisition of Pirvest. Negotiations continued privately between Fuqua and Henderson from late August to early September until October 10, 1979, when Pirvest publicly announced

that its Board of Directors was recommending that Pirvest stockholders accept the purchase offer negotiated by Fuqua. On October 31, Newcorp publicly announced its tender offer to purchase Pirvest stock from Pirvest shareholders at $16.50 per share, and on the same day Pirvest and Acquisition entered into an agreement of sale. The agreement provided that Acquisition would purchase all of the assets of Pirvest if Acquisition obtained at least 51% of the shares of Pirvest on or before November 21, 1979, the last day of the tender offer.

Despite the fact that Henderson did not tender any of his shares on account of personal financial and tax considerations, Acquisition obtained the requisite shares and acquired substantially all of Pirvest's assets on November 30. Following a complex transaction in which Acquisition bought Pirvest stock and subsequently exchanged the shares for Pirvest's assets, Pirvest ceased to operate retails stores and instead became engaged in the business of investing, reinvesting and trading the securities of other issuers. As of January 30, 1980, the securities of Pirvest were removed from the New York Stock Exchange and were no longer registered with the SEC. Furthermore, Pirvest stock is no longer publicly traded and immediately after the sale of assets, Henderson owned 80% of the then outstanding shares of Pirvest stock. Henderson's interest had increased to 94% in October 1980.

The parties have agreed that despite his title and status as executive vice-president, Wilson was neither involved in the negotiations concerning the sale of Pirvest assets nor had any knowledge of the tender offer until it was publicly announced. In fact, the parties stipulated that the tender offer was kept secret from Wilson prior to the announcement and he had difficulty in receiving tender offer material even after it was announced. Furthermore, it is uncontested that Wilson was unaware and uninformed of Pirvest's financial aspects and did not have access to any financial aspects of Pirvest's business, except for operating figures known by Pirvest employees in general.

As to Wilson's sale of 29,868 shares of Pirvest stock, which resulted in a net profit of $45,353.50, the parties are in further agreement that Wilson did not desire to sell or tender his shares of Pirvest stock, and "the *only reason* he did so tender his shares was because Henderson repeatedly informed Wilson that Wilson was required to tender his shares and that Wilson had no choice or alternative but to tender his shares." (Emphasis added.) Further, Wilson's continued employment was contingent upon his tender of the stock. There was uncontradicted testimony at trial that E. F. Hutton & Co., Inc., (Hutton), the tendering agent in the Pirvest acquisition, solicited the tender of shares from Wilson, and Wilson in fact tendered his shares to Hutton at the tender offer price on the last day of the tender offer. Moreover, while some Pirvest shareholders did not tender their shares, these non-tendering shareholders, other than Henderson, were persons who could not be located or contacted by Pirvest, or were original investors and friends of Henderson. On November 25, four days after the consummation of the tender offer and Wilson's tender of his shares, Henderson nonetheless informed Wilson that his employment with Pirvest was terminated.

## Conclusions of Law

Section 16(b) of the Securities Exchange Act of 1934 provides in relevant part that a statutory insider, which includes a beneficial owner, director, or officer, must surrender to the issuing corporation any profit realized from any purchase and sale, or any sale and purchase of any equity security of such issuer within any period of less than six months. The stated purpose of the "short-swing profit" rule is to prevent the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer. Fearing that insiders could exploit information not generally available to others to secure quick profits, Section 16(b) was enacted as "the only method Congress deemed effective to curb the evils of insider trading [for it is] a flat

rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). Section 16(b), which has been labeled a "crude rule of thumb," *see Hearings on Stock Exchange Practices Before the Senate Committee on Banking and Currency*, 73d Cong., 2d Sess., 6557 (1934), and its legislative history were recently re-examined by the Supreme Court in *Kern County.*[1] Based on this examination, the Court held that liability under Section 16(b) was unjustified because the specific transaction in issue was not one which serves "as a vehicle for the evil which Congress sought to prevent." *Kern County*, 411 U.S. 582, 594, 93 S.Ct. 1736, 1744 n.23, 36 L.Ed.2d 503. In so holding, the Court established a two part inquiry under which the presumption of liability under the short-swing profit rule may be rebutted. First, the transaction at issue is examined to determine if it is "unorthodox." If it is unorthodox, the Court proceeds to engage in an *ad hoc* review of the particular facts and circumstances to determine whether the specific transaction presented the possibility of speculative abuse of inside information.

The Court in *Kern County* applied this two part analysis to determine whether the transaction involved a "sale" within the meaning of the statute. The facts in *Kern County* involved Occidental Petroleum Corporation's attempt to gain control of "Old Kern." By acquiring more than 10% of Old Kern stock pursuant to a tender offer, Occidental became a statutory "beneficial owner." To prevent a takeover by Occidental, Old Kern arranged a defensive merger with a third company, Tenneco, Inc. As a result of the merger, Tenneco formed a new cor-

poration, "New Kern," which was to receive the assets and carry on the business of Old Kern. Old Kern shareholders were required to exchange their stock for Tenneco preference stock. Thus, as an Old Kern shareholder, Occidental became irrevocably bound to exchange Old Kern stock for Tenneco stock, and it granted Tenneco a call option with the right to purchase the to-be-acquired Tenneco stock pursuant to the defensive Old Kern-Tenneco merger. Immediately upon the exercise of Tenneco's option, Occidental exchanged its Old Kern certificates and transferred its newly acquired Tenneco stock to Tenneco under the call option. Old Kern shareholders had became "entitled" to Tenneco stock on the date the merger closed. Both this date and the date the option was executed (but not exercised) were within six months of Occidental's becoming a beneficial owner. New Kern brought suit under Section 16(b) alleging that Occidental's option agreement and stock exchange were "sales" which triggered Section 16(b), thereby requiring Occidental to disgorge its realized profits.

In deciding whether a "borderline transaction" is within the reach of Section 16(b) so as to "implement congressional objectives," *Kern County*, 411 U.S. 582, 594, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503, the *Kern County* Court noted that "unorthodox transactions" have been applied to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights and warrants." *Id.* at 594, n.24, 93 S.Ct. at 1744, n.24. *See Newmark v. RKO General, Inc.*, 425 F.2d 348, 351 (2d Cir.), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). Likewise, a tender offer has been found to fall within the unorthodox transaction rubric rather than a "gar-

---

1. The Supreme Court noted that:

    Among the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities. Closely allied to this type of abuse was

    the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others.

    *Kern County*, 411 U.S. 582, 592 n. 23, 93 S.Ct. 1736, 1743 n. 23, 36 L.Ed.2d 503, *citing* S.Rep.No. 1455, 73d Cong., 2d Sess. 55 (1934).

den variety" Section 16(b) claim. *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 637 (S.D.N.Y.1974); *see SEC v. Texas Int'l Co.*, 498 F.Supp. 1231, 1239 (N.D.Ill.1980).

Finding that the defensive merger was an unorthodox transaction, the *Kern County* Court next inquired into possible speculative abuse. The Court noted that Occidental was excluded from discussions concerning either an Old Kern-Occidental or Old Kern-Tenneco merger; Occidental did not participate in and had no control over the merger; Occidental had unsuccessfully attempted to postpone the date of the merger to avoid falling within the statutory period; Occidental required that the option be exercised after the six month period to limit speculative possibilities; Occidental never intended to sell its Old Kern holdings so long as Old Kern retained its separate corporate identity and the exchange of stock was required by the fact of the Old Kern-Tenneco merger and not by Occidental's choosing. The actual exchange of Occidental's Old Kern stock for Tenneco stock was understandable since Occidental wanted to avoid being "a minority stockholder with a huge investment in a company over which it had no control and in which it had not chosen to invest ... [and] Tenneco did not want a potentially troublesome minority stockholder that had just been vanquished in a fight for the control of Old Kern." *Kern County*, 411 U.S. 582, 601, 93 S.Ct. 1736, 1748, 36 L.Ed.2d 503. The Court commented that "[m]otivations like these do not smack of insider trading ...." *Id.* Moreover, the Court concluded that "[i]f Occidental had leverage in dealing with Tenneco, it is incredible that its source was inside information rather than the fact of its large stock ownership itself." *Id.*

This Court is aware that there are obvious differences between the instant action and *Kern County.* Wilson's transaction involved a sale and not an exchange of shares, and Wilson was an "insider" rather than a "beneficial owner." Moreover, Wilson's sale was purely voluntary when compared to Occidental's "sale" by virtue of its exchange of stock, for the exchange of stock was the result of a legal agreement

pursuant to Old Kern's merger with Tenneco. In other words, Occidental's status was affected not by its own actions, but solely by a legal agreement entered into by unrelated parties. Furthermore, the question in *Kern County*, unlike the present action, was whether the transactions involved amounted to "sales." It is clear that a sale of Wilson's stock occurred in the present transaction.

Despite these differences, the Court is of the opinion that the *principles* established in *Kern County* are equally applicable, even though Wilson undoubtedly purchased and sold his shares within the statutory period. The transaction was pursuant to a tender offer, which preceeded the sale of all of Pirvest's operating assets. The nature of Wilson's investment perforce would have changed substantially for Wilson would have held stock in a corporation which was basically a holding company controlled almost entirely by Henderson. The Court holds that this was an unorthodox transaction.

Secondly, this *specific* transaction, *see Gold v. Sloan*, 486 F.2d 340, 343 (4th Cir. 1973), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), did not present the opportunity for speculative abuse. Although it is true that Wilson was the executive vice-president of Pirvest, it has been held that:

.[l]iability under Section 16(b) is not based simply upon a person's title within his corporation; rather, liability follows from the existence of a relationship with the corporation that makes it more probable than not that the individual has access to insider information .... Insider information within the meaning of Section 16(b) encompasses that kind of confidential information about the company's affairs that would help the particular employee to make decisions affecting his market transactions in his employer's securities .... The title 'Vice President' does no more than raise an inference that the person who holds the title has the executive duties and the opportunities for

confidential information that the title implies. The inference can be overcome by proof that the title was merely honorary and did not carry with it any of the executive responsibilities that might otherwise be assumed.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston,* 566 F.2d 1119, 1121–22 (9th Cir. 1978). In the present action, Wilson's position as executive vice-president raises such an inference, but the inference is rebutted by the stipulations that he never attended a Pirvest board meeting and was neither informed of, nor had access to, confidential and relevant financial aspects of Pirvest's business. These uncontested facts conclusively overcome the presumption that Wilson had "opportunities for confidential information that [his] title implies." *Id.* at 1122.

Similarly, the facts and conclusions considered by the Fourth Circuit in *Gold v. Sloan,* 486 F.2d 340, *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), concerning the possibility of speculative abuse by corporate insiders are relevant here. The *Gold* court inquired whether a corporate insider had access to confidential information on account of his corporate status, which could lead to abuse in speculative trading for the purpose of realizing personal gain. Determining first that an exchange of stock pursuant to a merger was an unorthodox transaction, the court proceeded to examine the relationship between certain directors and the merging corporation. The court concluded that the co-founder of the merging corporation who had formerly served as the president and chief executive officer until his removal and reinstatement as chairman of the board had demonstrated a "want ... of a possibility of gainful private exploration of confidential inside information ...." *Id.* at 347. Among the factors the court considered were the defendant director's retention of his position on the board, not as a result of management's choice, but solely as a function of cumulative voting; his deliberate exclusion by the chief officers in actual control from any merger negotiations; and his ignorance of the actual terms of the

merger until he, along with the other shareholders, received identical notice of the merger in the form of a proxy statement. The defendant director thus had no opportunity "over and above that of any other stockholder to take advantage of any 'advance knowledge of information that would produce a rise in the market price' " of the stock. *Id.* at 346. While the *Gold* court referred to the defendant as a nominal director and outside stockholder, and distinguished him from another defendant who was an officer of the merging company, these facts do not call for a different conclusion in the instant action. The *Gold* court made clear that the key factor was not the officer/director distinction; the relevant inquiry instead was whether the defendant "enjoyed [the] confidences" of the corporation. *Id.* at 349. In the present action, it is clear that Wilson did not. The finding in the *Gold* decision that no possibility existed for speculative abuse is made even more compelling for the instant action by the fact that there are no contested issues of fact here, compared with the contradictions in the *Gold* pleadings and testimony concerning the defendant's authority and actions. *See id.* at 347.

Wilson's actions and position are distinguishable from those of insiders held liable under Section 16(b). In *Gold,* the one person found to have a possibility of speculative abuse even though the court did not believe he *actually* abused information for personal benefit, *id.* at 352, was the chief executive officer. He had complete charge and control of the merger negotiations as well as comprehensive knowledge of the financial condition of the merging company. Furthermore, he personally investigated the financial condition and prospects of merger candidates, selected his corporation's financial adviser in the merger negotiations, and admitted that he had access to the books and records of the surviving corporation, which gave him alone "superior knowledge." The Court concluded that his knowledge of inside information which would help him predict the future performance of the surviving corporation's stock

was the "source" of his possibility of speculative abuse. *Id.* at 352. *See also Newmark*, 425 F.2d 348.

Similarly, this Court found that the possibility of speculative abuse existed where the defendant corporation, a beneficial owner of more than 10% of the plaintiff corporation's stock, had some control over the timing of the stock transfer. The defendant also had been a major shareholder for ten years and had placed its nominees on the plaintiff's board of directors, which had been given projections prior to the transfer of stock in question. *Sprague Electric Co. v. Mostek Corp.*, 488 F.Supp. 842 (N.D.Tex.1980). *See also Allis-Chalmers Mfg. Co. v. Gulf & Western Indus., Inc.*, 527 F.2d 335 (7th Cir.), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1975). Unlike the defendant corporation in *Sprague Electric*, Wilson neither had access to inside information nor the ability to influence the timing of the transaction.[2]

In conclusion, while the Court is not unmindful of the intentional harshness and extensive scope of Section 16(b), it cannot ignore the narrowing of the statute which *Kern County* and its progeny effected. Even when the *Kern County* exception is itself narrowly construed, there can hardly be a more compelling set of facts and circumstances to dispel any question of Wilson's opportunity for speculative abuse. The Court notes that Lewis' counsel might not have conceded as many determinative facts had he acknowledged their relevance and materiality under the *Kern County* rationale. Having stipulated in the Pre-Trial Order that Wilson's sale was based solely on Henderson's directive, that Wilson had no access to any financial information which was in any way relevant to the tender offer, and that Wilson in fact had difficulty in obtaining information after the tender

offer was made public since at this point Henderson essentially excluded him from the inner workings of the Pirvest management, Lewis has, in effect, surrendered his claim. The Court holds that Wilson could not possibly have abused his alleged insider position. Wilson thus did not violate Section 16(b), and is not required to disgorge the profits he realized from the sale of his Pirvest stock.

The decision reached by the Court at this time which relieves Wilson of any liability also disposes of Wilson's counterclaims against Pier I, Henderson and Pirvest. Wilson is asserting his counterclaim only in the event that Lewis recovers the short swing profits under Section 16(b). Judgment may now be entered resolving all pending issues.

---

2. Wilson asserts as a defense that his sale constitutes a "forced sale." Although this Court considered the question in *Sprague Electric*, 488 F.Supp. 842, 845, the Court is of the opinion that because it is clear that Wilson had no access to inside information concerning the tender offer, it need not determine whether Wilson was legally "forced" to sell his shares.

The Court notes, however, that a defendant bears an unusually heavy burden in demonstrating that a sale was legally compelled. *See Makofsky*, 383 F.Supp. 631, 642; *Western Auto Supply Co. v. Gamble-Skogmo, Inc.*, 348 F.2d 736 (8th Cir. 1965), *cert. denied*, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966).