**T–BAR INCORPORATED, Plaintiff,**

v.

**Purnendu CHATTERJEE and John
Beall & Co., Defendants.**

No. 87 Civ. 1331 (JEL).

United States District Court,
S.D. New York.

Aug. 3, 1988.
As Amended Aug. 23, 1988.

Cooper Cohen Singer & Ecker, by Barry
Singer, New York City, for plaintiff.

Willkie Farr & Gallagher, by Brian E. O'Connor, Stephen Greiner, Susan E. Amron, New York City, for defendants.

## OPINION

LUMBARD, Circuit Judge: *

T-Bar, Inc. brings suit under section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p, to recover short-swing profits from Purnendu Chatterjee and John Beall & Co. for their transactions in T-Bar securities from October 3, 1986 through December 30, 1986. Plaintiff seeks to compel defendants to disgorge $748,310.30 of alleged short-swing profits, a "premium" of $156,250, interest, and attorney's fees pursuant to § 16(b) of the Act. Jurisdiction is based on § 27 of the Act, 15 U.S.C. § 78aa. Venue is in the Southern District, where the transactions took place.

T-Bar, a Maryland corporation with its principal place of business in Wilton, Connecticut, is engaged in the manufacture, marketing and sale of electronic switching and control systems and related products for large, multi-main frame computer systems and communication networks. Throughout the period relevant to this suit, its common stock and debentures were registered pursuant to § 12 of the Securities Exchange Act of 1934 and were publicly held and traded.

Defendant John Beall & Co., now known as Beall Technologies, Inc., is a New Jersey corporation having its principal office in North Bergen, New Jersey. Defendant Purnendu Chatterjee is the chairman, the president and one of the two directors of Beall and the holder of a majority of Beall's outstanding common stock.

At trial T-Bar produced evidence of numerous purchases of T-Bar stock and convertible debentures by John Beall & Co. and Chatterjee, and others acting for them, from July to October, 1986. The court finds that by October 10, the defendants held an interest representing more than ten percent of T-Bar's common stock. Accordingly, the defendants are liable for short-swing profits on those securities purchased after October 10 and sold within six months.

The undisputed evidence is as follows:

On August 20, 1986, T-Bar filed a registration statement for a public offering of $20 million principal amount of nine percent convertible debentures. On October 3, 1986, however, T-Bar amended its registration statement, and reduced the amount of convertible debentures offered from $20 million to $15 million aggregate principal amount. Kidder Peabody & Co., Inc. (Kidder) and Needham & Company, Inc. (Needham) were listed as the underwriters of the offering. Meanwhile Beall had been buying T-Bar common stock and by September 9, 1986, it had accumulated 34,500 shares.

Prior to September 30, 1986, defendants decided to acquire as much of the debenture offering as possible. On Beall's behalf, Chatterjee, John Soros (an investment banker and money manager who is a minority owner of Beall)[1] and Joe Orofino, a trader at Soros Fund Management Co. told Chuck Trueholt of Arnhold and S. Bleichroeder (Bleichroeder) that Beall wanted to purchase a substantial portion of the offering, without disclosing to Kidder or T-Bar that it was Beall who was acquiring the position. They asked Bleichroeder to become a member of the Selling Group and told Trueholt to obtain between $5 and $7 million worth. The syndication records of Kidder indicate that by 9:56 a.m. on September 30, Bleichroeder was added to the deal as a member of the selling group. Bleichroeder then placed an order for up to $10 million, or half, of the $20 million debentures. On October 1, Bleichroeder reduced its indication of interest to $7,500,-000.

On September 30, 1986, Citibank agreed to make available to Beall a credit facility for general corporate purposes in the

---

* Sitting by designation.

1. On October 6, 1986, Beall documented its agreement with Soros, pursuant to which Soros agreed to provide up to $35 million—$10 million in cash and a $25 million guarantee of the Citibank Credit Facility—to finance the acquisition of T-Bar by a subsidiary of Beall.

amount of $25 million. This "Citibank Credit Facility" was guaranteed by Soros.

Defendants also decided to purchase additional T–Bar debentures from Kidder. Acting with Soros, they instructed Orofino to buy T–Bar debentures from Kidder for the accounts of Lupa Family Partners (Lupa). The records of Kidder show that on October 2, an institutional order in the name of Soros Fund Management was recorded with a request for $2 million in bonds.

Chatterjee testified that he requested Sheldon Claar, a general partner in Stuart Mott & Associates, an investment advisory firm, to order the debentures for the account of Lupa Family Partners. Kidder's records show that on October 1, 1986, an institutional order in the name of Claar was added to the deal, again with a requested amount of $2 million of the debentures.

On October 3, 1986, at 9:30 a.m., the amended registration statement reducing the aggregate principal amount of T–Bar convertible debentures being offered from $20 million to $15 million became effective. Immediately prior to the effective date, the lead underwriters, Kidder and Needham agreed to purchase from T–Bar the entire issue of the debentures. Bleichroeder had agreed to purchase $2,250,000 of the debentures. The closing of the public offering, at which the debentures were sold to Kidder and Needham, took place at 10:00 a.m. on October 10.

On October 1, the underwriters had committed to Bleichroeder $2,250,000 of the T–Bar debenture offering. On October 3, Bleichroeder's allocation was increased to $2,500,000. An order ticket reflecting Beall's purchase from Bleichroeder of $2,500,000 million worth of T–Bar convertible debentures was time stamped by Bleichroeder on October 3, at 11:29 a.m.

On October 3, the underwriters wired Bleichroeder confirming its allocation of $2,500,000 of T–Bar debentures to Bleichroeder. The same day, defendants learned that Bleichroeder had obtained an allocation for them of $2.5 million of the debentures.

Between 1:30 p.m. on October 3 and 9:45 a.m. Monday, October 6, Beall, acting through Bleichroeder, also purchased 12,100 shares of T–Bar common stock on the open market at $5.25 per share. That order was confirmed to Beall, care of Chatterjee in New York, with a trade date of October 3, 1986 and a settlement date of October 10, 1986.

On October 6, Beall received a confirmation from Bleichroeder for its $2,500,000 purchase of debentures. The confirmation reflected a trade date of October 6 and a settlement date of October 10. It stated both that a prospectus was enclosed and that a prospectus would follow.

On October 6, Kidder confirmed to Lupa Family Partners, care of Soros, its purchase of $400,000 of T–Bar debentures, with a trade date of October 6, and a settlement date of October 10. On the same day, Kidder confirmed to Lupa Family Partners, in care of Claar, its purchase of $175,000 of T–Bar debentures likewise with a trade date of October 6, and a settlement date of October 10, 1986.[2]

On October 6, Bleichroeder purchased for Beall 24,300 common shares of T–Bar stock at a price of $5.369 per share. That order was confirmed to Beall, with a trade date of October 6, 1986 and a settlement date of October 14. The closing of the sale of $15 million of T–Bar debentures to the underwriters commenced at 10:00 a.m. and was completed promptly on October 10.

Beall also purchased on October 10 an additional $250,000 of T–Bar debentures at $1,033.75 for each $1,000 of debentures. Such purchases were confirmed to Beall,

**2.** Unlike the Bleichroeder commitment for the benefit of Beall, Kidder did not send wire transfers to Soros or Claar or Lupa Family Partners. These purchases were billed on confirmation, and were accompanied by the final prospectus. Soros Fund Management wrote to Bleichroeder on October 8, 1986 confirming that the $575,000 of T–Bar convertible debentures pruchased by Lupa should be transferred from the account of Lupa to the account of Beall and that Lupa should be credited for the purchase price. The $575,000 of T–Bar subordinated debentures were delivered to Bleichroeder for the account of Lupa on October 14, 1986.

with a trade date of October 10, and a settlement date of October 20.

On October 20, Beall purchased 10,300 additional shares of T–Bar common stock at $5.25 per share, with a settlement date of October 27.

On October 30, Beall, through its wholly-owned subsidiary, JBC Acquisition Company, made a cash offer for any or all outstanding shares of T–Bar common stock at $7.25 per share and for any and all outstanding T–Bar nine percent convertible debentures at $1,250 per $1,000 principal amount.

On November 26, Data Switch, having negotiated a merger agreement with T–Bar as of November 24, made a competing cash offer of $8.25 per share for up to 70 percent of all outstanding shares of common stock. (The cap on this tender offer included the possibility of the exercise of all outstanding stock options at or below $8.25 and conversion of all outstanding debentures).

On December 5, Chatterjee wrote to Morgan of T–Bar requesting that T–Bar grant Citicorp Industrial Credit, Inc., Atlanta, Georgia, (CIC) access to the books and records of T–Bar in accordance with CIC's customary procedure with respect to its commitment to finance a possible offer by Beall to acquire T–Bar at an increased price. Pursuant to agreements dated December 12 between T–Bar and Beall and T–Bar and CIC, CIC agreed not to disclose to Beall any proprietary information received from T–Bar and Beall agreed not to seek disclosure of such proprietary information from CIC. The defendants also agreed that they would not acquire additional T–Bar shares or debentures or amend their tender offer unless they increased the amount offered to $8.75 per share and $1,458.33 per $1,000 debenture. They also agreed not to make a new tender offer for less than those amounts.

T–Bar granted the requested access and CIC examined the books and records of T–Bar during December. After that examination, Beall announced on December 22, 1986 that it would not increase its offer for the shares and debentures of T–Bar and that it was withdrawing its tender offer which had been made on October 30.

By its terms, Data Switch's offer for T–Bar common stock expired at midnight on December 24. On the same day, having decided to withdraw its tender offer, Beall, cashed in. Beall submitted all of its $3,325,000 of T–Bar debentures for conversion into 554,166 shares of the common stock of T–Bar, to be followed by the tender of those shares into the Data Switch offer and Beall then tendered all of its shares of T–Bar common stock to Data Switch whose offer which expired at midnight on December 24, 1986. The right to withdraw tendered securities was extended from midnight until 3:30 p.m. New York City time on December 29. On December 30, Data Switch accepted for payment 4,447,348 shares of T–Bar common stock at $8.25 per share, which included all shares of T–Bar common stock tendered by Beall and those shares of common stock which were issued to Beall upon the conversion of its debentures on December 24.

Section 16(b) of the Exchange Act entitles an issuer of registered securities to recover profits realized by a beneficial owner of more than ten percent of a class of the issuer's securities when that beneficial owner either purchases and sells or sells and purchases such securities within a six-month period.[3]

T–Bar maintains that (1) the conversion by Beall of its T–Bar debentures and its sale of T–Bar stock were voluntary transactions and not unorthodox transactions that would be exempt from the application of the short-swing profit sales of § 16(b); (2) Beall's conversion of T–Bar debentures constituted both a sale and purchase under the rules adopted by the Securities and Exchange Commission (SEC) pursuant to § 16 of the Exchange Act; (3) Beall be-

---

**3.** A holder of convertible debentures is deemed to own the number of shares of common stock which he would receive upon a hypothetical conversion for the purposes of determining whether he owns ten percent of more of an issuer's outstanding stock. *See Chemical Fund, Inc. v. Xerox Corp.,* 377 F.2d 107 (2d Cir.1967).

came a 10 percent shareholder in T–Bar on October 3, 1986, when it became firmly committed to purchase $2,050,000 of T–Bar debentures in the public offering; (4) there is no defense of waiver available for a § 16 claim; (5) T–Bar is entitled to recover $756,302.05 in profits, prejudgment interest on that amount since December 30, 1986 plus a "premium of $156,250"; and (6) this is an appropriate case for the award to plaintiff of its fees and expenses, including attorney's fees.

Defendants counter that (1) Beall's sale of T–Bar stock into the Data Switch tender offer was involuntary and unorthodox and, hence, did not violate § 16(b); (2) Beall's submission of its T–Bar debentures for conversion and tender was neither a sale of the debentures nor a purchase of common stock for the purposes of assessing § 16(b) liability; and (3) Beall only became a ten percent shareholder of T–Bar on October 10, 1986 (the closing date of the offer), when it purchased $3,075,000 of T–Bar debentures in the public offering ($2,500,000 for its own account through Bleichroeder and $575,000 via Lupa).

Defendants concede that by October 10, Beall was the beneficial owner of more than ten percent of T–Bar stock. Consequently, the defendants are liable pursuant to § 16(a) for profits realized from the purchase and sale of any T–Bar securities after October 10. In addition, the court finds that Beall's purchase of securities and their sale within six months after October 10 were the deliberate and free choice of the defendants.

■ The court is not persuaded by the argument that the tender of securities to Data Switch which resulted in the realization of profits was, under *Kern County Land Co. v. Occidental Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), an unorthodox transaction for which the defendants would incur liability to T–Bar because it would not have constituted a sale by Beall under § 16(b).

Unlike the defendant in *Kern County*, Beall made a business decision to tender its shares into the Data Switch offer. Since the Data Switch offer was for only 70 percent of the outstanding stock of T–Bar, Beall could have held on to its T–Bar stock and debentures. In submitting its debentures for conversion and tendering all its common stock, Beall thus made an informed decision. Since such a decision clearly would have been influenced by inside information, Beall's tender did present an opportunity to use inside information. It cannot avail itself of exemption from § 16(b) for unorthodox transactions that was recognized by *Kern County*.

There was evidence that T–Bar had indirect access to non-public T–Bar information through the agreement reached by T–Bar, Beall, and CIC under which T–Bar provided CIC with access to T–Bar's books and records. The provisions of § 16(a) presume that when any stockholder owns more than ten percent of a corporation's stock that stockholder is in a position to ask and obtain information about the business of the company which is known to the public. This appears to have been the case here. Even though the agreements between T–Bar and Beall and T–Bar and CIC prohibited CIC from disclosing any proprietary information to Beall and Beall from seeking disclosure of such information from CIC, the mere fact that, after CIC had examined these records, Beall announced that it would not make a new higher offer is an indication that Beall may have been given a signal regarding CIC's appraisal of T–Bar's financial condition. But, regardless of what Beall may have known, it is well established that, under § 16(b), a holder of a ten percent interest may not profit from any purchase or sale within six months.

The court thus reaches the question of the extent of Beall's liability for short-swing profits, if any, under § 16(b).

■ The court finds that Beall did not become a 10 percent shareholder of T–Bar until October 10, 1986. For purposes of § 16(b) liability, a purchase only occurs when the purchaser "has incurred an irrevocable liability to take and pay for the stock and his rights and obligations have become fixed." *Riseman v. Orion Research, Inc.*, 749 F.2d 915, 918–19 (1st Cir. 1984); *Prager v. Sylvestri*, 449 F.Supp.

425, 432 (S.D.N.Y.1978) ("the critical moment in the initial 'purchase' or 'sale' for the purpose of determining when the transaction occurred within the meaning of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction...."). The court finds that even though Beall may have made arrangements, prior to October 10, to execute the $2,500,000 purchase of debentures for its own account made through Bleichroeder and the $400,000 and $175,000 purchases of T–Bar debentures that Beall effected through Lupa Family Partners, those arrangements did not constitute the irrevocable purchases necessary for § 16(b) liability to attach.[4] *See Provident Securities Co. v. Foremost McKesson, Inc.*, 506 F.2d 601, 607 (9th Cir.1974), *aff'd on other grounds*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

Securities cannot be sold until the applicable registration statement becomes effective. The effectiveness of the registration statement, therefore, was a condition precedent to the validity of any agreement to purchase T–Bar debentures made prior to the effective date of the registration statement. Where a contract for the purchase of a security requires the occurrence of a condition precedent to its effectiveness, a purchase does not occur until the fulfillment of that condition precedent. *See Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 301 (2d Cir.), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956).

Even if Bleichroeder and Kidder were firmly committed or at risk for their allocation of debentures on October 3 at the time the registration statement became effective, both Beall, as a customer of Bleichroeder, and Lupa, as a customer of Kidder, were not acting as underwriters for the offer, and were not at risk or firmly committed until after they received a final prospectus. Both Beall and Lupa had a reasonable time after their receipt of the final prospectus to disaffirm their orders.[5] The debentures were a new offering; they could not be delivered unless preceded or accompanied by a prospectus. Securities Act of 1933 § 5(b), 15 U.S.C. § 77e(b). There is no evidence that Beall or Lupa received a final prospectus until October 10. Consequently, regardless of when the underwriters may have become committed to purchase their allocations of the debentures, Bleichroeder's sale of debentures to Beall and Kidder's sale to Lupa for Beall's benefit, did not occur until the final prospectus became available to Beall on October 10.

The court finds that the prospectus became available to Beall and Lupa at the time of closing on October 10. Beall thus became the direct or beneficial owner of $3,075,000 of T–Bar debentures in a single transaction and thereby the beneficial owner of more than ten percent of the common stock of T–Bar for purposes of § 16(b) at 10:00 a.m. on October 10.

Prior to their irrevocable commitment to purchase the debentures on October 10, defendants owned less than 10 percent of T–Bar's common stock or convertible debentures convertible into common stock. Thus, neither Beall's purchases of T–Bar stock and debentures which occurred prior to that time nor the purchase of debentures in the public offering which occurred at 10:00 a.m. on October 10 constituted purchases made while it was a ten percent shareholder. For § 16(b) liability to attach, the insider must have owned ten percent of the issuer's stock (or, as here, convertible securities that are convertible into more than ten percent of the issuer's stock) both at the time of the purchase and of the sale.

---

4. Beall does not dispute that it was the beneficial owner of the $575,000 in T–Bar debentures purchased by Lupa.

5. The court rejects plaintiff's contention that Beall was a "presumptive underwriter" of the T–Bar debenture offering. Even though Beall purchased more than ten percent of the debenture issue, Beall was in no sense an underwriter of the issue because it was purchasing the debentures for its own account as part of its plan to acquire T–Bar, rather than with the intent of distributing them to the public. Beall never sold the debentures to the public. Instead, transferred them to Data Switch by submitting them for conversion and then tendered them for cash.

*Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 250, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976); *Stella v. Graham-Paige Motors Corp.*, 232 F.2d at 300–301.

As a result, the only transactions at issue are Beall's purchases of $250,000 principal amount of T–Bar debentures after 10:00 a.m. on October 10 and of 10,300 shares of common stock on October 20. The court rejects T–Bar's theory that the conversion and tender of the other debentures should be viewed as separate transactions, and Beall should be held to have made a purchase of T–Bar stock at the time it converted its debentures. A conversion of a convertible security into another security of the same issue does not involve either a purchase or a sale. *See Blau v. Lamb*, 363 F.2d 507, 525 (2d Cir.1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967) (conversion of preferred stock into common stock found not to constitute a sale of the preferred stock); *see also Blau v. Max Factor & Co.*, 342 F.2d 304, 308–09 (9th Cir.), *cert. denied*, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965) (conversion of common stock into Class A common stock did not constitute a purchase of the Class A common stock.) In addition, this interpretation is consistent with the interpretation of a conversion promulgated by the SEC in Rule 16b–9 under the Securities Exchange Act of 1933, 17 C.F.R. § 240.16b–9. Rule 16b–9 generally provides that the conversion of one equity security (such as preferred stock or convertible debentures) into another equity security (such as common stock) does not constitute either a sale of the security converted or a purchase of the security acquired upon conversion.

The court finds that Beall is liable to T–Bar for the profit on the October 10 purchase of $250,000 principal amount of debentures and the October 20 purchase of 10,300 shares of T–Bar common stock. Beall paid $258,437.50 for the 250,000 principal amount of T–Bar debentures it purchased on October 10 and $54,075 for the 10,300 shares of T–Bar common stock purchased on October 20. Beall also paid and is entitled to deduct from its profits $1,187.50 in accrued interest for the debentures and $515 in commissions for the common stock.

The debentures were converted into common stock at a ratio of 166⅔ shares per each $1,000 in principal amount. When Beall converted its debentures as part of its tender into the Data Switch offer, it obtained 41,666 shares in exchange for the debentures. Beall received $8.25 per share, for a total of $343,744.50 for the shares tendered from the conversion of the debentures and $84,975 for the other shares. Beall's profit from these two sales is thus $114,504.50 (the amount Beall received for the tendered securities ($428,719.50) less the price it paid for, and the costs it incurred in purchasing, those securities ($312,512.50 + $1,782.50)).

The court rejects plaintiff's claim that it is entitled to recover a premium which Beall received on its sale of the bonds. Such a premium may be appropriate in a case under § 16(b) when an insider controls a block of securities that would allow it to control the timing of a change in corporate control such that it could maximize its profits from selling or exchanging its securities. *See Newmark v. RKO General, Inc.*, 425 F.2d 348 (2d Cir.), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). There is no evidence that Beall had any control over the Data Switch offer —it simply tendered its securities to Data Switch, as did each of the other non-controlling shareholders.

The court denies plaintiff's request for attorney's fees. Section 16(b) makes no general provision for the award of attorney's fees in actions brought to recover short-swing profits. The statute only provides for the award of legal fees in derivative actions brought on behalf of the issuing corporation by its shareholders.

The court grants plaintiff's request for prejudgment interest. Beall's liability should have been clear when it tendered its stock to Data Switch on December 30, 1986. In light of this, the court finds that the award of prejudgment interest is appropriate.

Judgment will be entered for plaintiff in the amount of $114,504.50 plus prejudgment interest from December 30, 1986.

This opinion constitutes the findings of facts and conclusions of law, Fed.R.Civ.P. 52.