**David COLAN, Plaintiff,**

**and**

**Unocal Corporation, Plaintiff–Appellant,**

**v.**

**MESA PETROLEUM CO., et al.,
Defendants–Appellees.**

**David COLAN, Plaintiff–Appellant,**

**and**

**Unocal Corporation, Plaintiff,**

**v.**

**MESA PETROLEUM CO., et al.,
Defendants–Appellees.**

**Nos. 90–55641, 90–55643.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1991.

Decided Aug. 8, 1991.

Darryl Snider, Brobeck, Phleger & Harrison, Los Angeles, Cal., for plaintiff-appellant Unocal.

William Lerach, Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, Cal., for plaintiff-appellant David Colan.

James Edward Maloney, Baker & Botts, Houston, Tex., for defendants-appellees.

Before GOODWIN, PREGERSON and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

In this action for recovery of short-swing profits brought pursuant to section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), Unocal Corporation appeals from the denial of its cross motion for summary judgment, and the order granting a motion for summary judgment in favor of Mesa Petroleum Company, Mesa Southern Company, Mesa Asset Company, CY–41, Inc., and Jack–41, Inc. (Mesa Defendants). We must decide whether an exchange by a beneficial owner of its common stock for non-convertible debt securities, in response to a self-tender offer, is a "sale" within the meaning of section 16(b) of the Securities Exchange Act of 1934. We reverse because we have concluded that an exchange of common stock for a negotiable debt security pursuant to a self-tender offer is a "sale" within section 16(b).

Unocal's contentions on appeal can be summarized as follows:

One. The district court erroneously weighed the evidence and made credibility determinations on ruling on cross motions for a summary judgment.

Two. The district court erred in concluding that Mesa's exchange of Unocal common stock for negotiable debt securities in response to its self-tender offer

was an "unorthodox transaction," and not a "sale" requiring a disgorgement by the Mesa Defendants of any profits that may have been realized as a result of this transaction.

## PERTINENT FACTS

In October of 1984, Mesa Partners II was formed and began accumulating stock in Unocal. The general partners in Mesa Partners II were: (1) Mesa Asset Company, a wholly owned subsidiary of Mesa Southern Company, which is a wholly owned subsidiary of Mesa Petroleum Company; (2) Cy–41, Inc., wholly owned by Cyril Wagner, Jr.; and (3) Jack–41, Inc., wholly owned by Jack E. Brown.

Cyril Wagner, Jr., and Jack E. Brown are the sole partners of Wagner & Brown, and Brown & Wagner. Cyril Wagner, Jr., and Jack E. Brown, along with Brown & Wagner, are also the partners of Wagner & Brown II. T. Boone Pickens was the President and Chairman of the Board of Directors of Mesa Petroleum Company, President of Mesa Assets Company, and President of Mesa Southern Company. This joint venture shall be referred to as Mesa Partners II in this opinion.

On February 14, 1985, Mesa Partners II filed a Schedule 13D statement[1] with the Securities and Exchange Commission (SEC), in which it reported that it had acquired 7.3 percent of Unocal's common stock for investment purposes. By February 22, 1985, Mesa Partners II owned 17 million shares of Unocal's common stock, representing 9.7 percent of the outstanding shares.

Unocal initiated defensive measures in order to discourage a perceived takeover threat by Mesa Partners II. On February 25, 1985, Unocal amended its bylaws concerning the procedures for nominating directors and making shareholder proposals. Unocal also filed an action in the Superior Court of the State of California for the County of Los Angeles against Security Pacific National Bank on March 12, 1985, for breach of fiduciary duty, breach of contract, and deceit and misrepresentation in connection with loans it made to Mesa Partners II. Mesa Partners II used the money obtained from these loans to purchase Unocal common stock. Mesa Petroleum Company and Mesa Asset Company responded by filing an action in the same court against Unocal on March 21, 1985, alleging wrongful interference with their banking relationships.

On March 27, 1985, Mesa Partners II acquired a total of 6.7 million shares of Unocal common stock at $48.10 per share. This transaction increased Mesa Partners II's shares to 23.7 million and its ownership interest to 13.6 percent of Unocal's common stock.

On March 28, 1985, Mesa Partners II amended its Schedule 13D statement. Mesa Partners II reported to the SEC that it "may seek to obtain control of the company or to participate in the formulation, determination or direction of the basic business decisions of the Company." Mesa Partners II also indicated that it intended to solicit proxies to gain postponement of the annual Unocal shareholders meeting then scheduled for April 29, 1985.

On April 1, 1985, Unocal filed a complaint alleging violations of section 13(d) of the Securities and Exchange Act of 1934 against T. Boone Pickens, Jr., Cyril Wagner, Jr., Jack E. Brown, Mesa Partnership, the Partners and certain affiliates of the Partners in the United States District Court for the Central District of California. Unocal claimed that the named defendants or their agents made false and misleading representations in Mesa Partners II's original Schedule 13D statement by indicating that it acquired Unocal common stock for investment purposes. The defendants filed a counterclaim on April 12, 1985, alleging that Unocal violated proxy solicitation rules.

---

1. Section 13(d) of the Securities Exchange Act of 1934 requires any person who becomes a beneficial owner, directly or indirectly, of more than five percent of any class of equity security to file a statement of ownership with the Securities and Exchange Commission within ten days after reaching the five percent threshold. 15 U.S.C. § 78m(d)(1) (1988). *See also* 1 T. Hazen, *The Law of Securities Regulation* § 11.10 at 688 (2d ed. 1190).

On April 8, 1985, Mesa Partners II made a tender offer to purchase 64 million shares of Unocal common stock at $54 per share.[2] Unocal's Board of Directors recommended that Unocal's shareholders reject Mesa Partners II's tender offer as inadequate and not in their best interests.

On April 16, 1985, Unocal offered to exchange "a package of its debt securities with an aggregate principal amount of $72 ... consisting of (i) $20 principal amount of 14% Senior Secured Notes Due 1990, (ii) $32 principal amount of Floating Rate Senior Secured Notes Due 1991 and (iii) $20 principal amount of Senior Secured Extendible Notes Due 1997" for up to 87.2 million shares (approximately one-half) of Unocal's outstanding common stock. This offer was originally conditioned upon Mesa Partners II's "acceptance for payment of 64,000,000 Shares pursuant to the Mesa Offer." Unocal modified its offer on April 23, 1985, to provide for the purchase of "up to 50 million shares of its common stock in exchange for $72 per share in senior secured notes, whether or not Mesa purchased the 64 million shares it was seeking through its tender offer."

Unocal stated in its offer that one of its express purposes was "to make it more difficult for Mesa Bidders to complete the Mesa Offer." Unocal expressly excluded Mesa Partners II from participating in its exchange offer. Unocal's exchange offer provided that

> [t]he Company [Unocal] will not accept for exchange, or issue Securities in exchange for, any Shares tendered by or on behalf of Mesa Petroleum, Mesa Partnership, Mesa Sub or any person controlling, controlled by or under common control with any of the foregoing (collectively, the "Mesa Group"), nor any Shares tendered by or on behalf of any other person that were transferred, directly or indirectly, after the date of this Offer to

Purchase to such person by any member of the Mesa Group.

On April 22, 1985, Mesa Partners II challenged its exclusion from Unocal's tender offer in Delaware state court. On April 29, 1985, the Court of Chancery temporarily restrained Unocal from proceeding with its offer unless it included Mesa Partners II.

On May 14, 1985, representatives of Unocal and Mesa Partners II, including T. Boone Pickens, met in an attempt to negotiate a settlement. These discussions broke off without resolution. On May 17, 1985, the Delaware Supreme Court reversed the Court of Chancery and held that Unocal was not prohibited by law from excluding Mesa Partners II from its tender offer.

Following the Delaware Supreme Court's decision, representatives of Mesa Partners II contacted Unocal and sought to reopen negotiations. After several rounds of negotiations, an agreement was reached on May 20, 1985.

Pursuant to the agreement, the "Mesa Entities" were allowed to participate in Unocal's self-tender offer.[3] Mesa Partners II agreed to terminate its tender offer. In addition, Mesa Partners II agreed that it would not participate in any proxy solicitation and would not acquire any additional Unocal shares for a period of twenty-five years. Mesa Partners II also agreed that, for a period of ten years, it would vote its Unocal stock on all matters in the same way and "in the same proportion as the votes cast by holders of Shares other than the Mesa Entities." In addition, Mesa Partners II agreed to strict controls on its ability to sell its Unocal common stock.

On the same date, Mesa Partners II exchanged approximately 7.8 million shares of Unocal common stock for negotiable debt securities.[4] Each of these securities had a stated maturity date and provided for periodic interest payments. Mesa Asset

---

**2.** Mesa Eastern, Inc., a wholly owned subsidiary of Mesa Partners II, joined with Mesa Partners II in this tender offer.

**3.** The Mesa Entities included Mesa Petroleum Company, Mesa Asset Company, Mesa Partners II, Mesa Eastern, Inc., Cy–41, Inc., Jack–41, Inc.,

Cyril Wagner, Jr., Jack E. Brown, T. Boone Pickens, Jr., Wagner & Brown, Brown & Wagner, and Wagner & Brown II.

**4.** Mesa Partners II was dissolved on May 20, 1985.

Company sold these debt securities on July 3, 1985, for approximately $589 million.

## PROCEDURAL BACKGROUND

On June 3, 1986, David Colan, a shareholder in Unocal, filed a derivative action on behalf of Unocal, alleging violations of section 16(b) by the Mesa Defendants. The action sought recovery of short-swing profits realized by Mesa. Unocal was originally named as a defendant in this action, but was realigned as a real party plaintiff on August 3, 1989.

On September 25, 1989, the Mesa Defendants filed a motion for summary judgment, in which they argued that the exchange of their common stock for Unocal's debt securities was not a sale within section 16(b). The Mesa Defendants argued that their exchange of stock for negotiable debt securities was not a sale because it fell within the "unorthodox transaction" defense to section 16(b) liability announced by the Supreme Court in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). The district court denied the Mesa Defendants' motion for summary judgment on October 23, 1989, concluding that genuine issues of material fact existed.

On December 1, 1989, Unocal filed a motion in limine in which it requested the district court to rule, as a matter of law, that the "unorthodox transaction" defense to a section 16(b) violation was inapplicable. In addition, Unocal sought a protective order precluding the Mesa Defendants from introducing any evidence before the jury concerning the "unorthodox transaction" defense. Unocal asserted that if any facts were in dispute concerning the applicability of the "unorthodox transaction" defense, the district court should conduct an evidentiary hearing to resolve the issue before the selection of the jury.

In their opposition to Unocal's motion in limine, the Mesa Defendants "renew[ed] [their] motion for a summary judgment and urge[d] th[e] court to accept plaintiff's belated admission that this is an issue for the Court where the record is sufficiently developed to permit the Court to determine whether the unorthodox transaction exception applies to these facts."

A hearing on the motion in limine was scheduled for January 4, 1990. On that date, the court informed counsel that it would decide the in limine motion concerning the "unorthodox transaction" defense "if there is agreement, unequivocal agreement among counsel that the facts are sufficiently developed to rule on this matter."

Mr. Michael Diamond, counsel for Mesa Petroleum Company, argued that a motion in limine was not the proper vehicle to decide this question. Instead, Mr. Diamond contended that summary judgment is "the way we think it should be decided." After further colloquy, Mr. Diamond stated: "[W]e now renew our summary judgment motion...."

After a brief recess was granted so that Unocal's counsel could consider Mr. Diamond's suggestion, Mr. William Lerach, one of Unocal's attorneys, informed the court as follows: "We are prepared to have the Court treat this issue as tendered to it, if you will, on cross summary judgment motion...."

After further discussion, the court stated: "[Y]our motion in limine will be considered as a cross motion for summary judgment, and Mesa's previously filed summary judgment motion will be reconsidered by the Court, and the record is to be supplemented by a national best seller." The court granted Unocal's unopposed request to receive, as an exhibit, a book written by Mr. T. Boone Pickens. The court declined to hear oral argument concerning the "unorthodox transaction" defense issue.

On January 22, 1990, the court entered an order which "grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Cross–Motion for Summary Judgment."

On January 26, 1990, a hearing was held to determine whether the case should proceed to trial before a jury on January 30, 1990. Unocal argued that a trial was necessary even if the May 20, 1985, exchange of stock for debt securities was an "unor-

thodox transaction," because the July 3, 1985, disposition of the debt securities by Mesa was a "sale" within section 16(b). The district court reminded Unocal's counsel that during the January 4, 1990, hearing

you stipulated and agreed that [the in limine] motion may be considered as a cross motion for summary judgment, and also the representation was made that all of the facts necessary to decide those issues were in the record, either in the motion that was filed by Mesa as Mesa's second motion for summary judgment or in your motion for in limine and elsewhere.

The court informed the parties that they could file supplemental motions relating to the January 19, 1990, order. Counsel for Unocal then inquired as follows:

MR. LERACH: Your Honor, just so I'm clear. You want this done on the existing factual record.

THE COURT: Well, if there are facts that—you see, again, you pose great problems for me. Because the representation was made, it was an unequivocable representation on January the 4th that all of the facts were in the record upon which I could base whatever findings, whatever inferences I could draw for the purpose of ruling on the cross motions for summary judgment. Those facts were before me.

MR. LERACH: That is still our position.

THE COURT: All right.

MR. LERACH: I'm not changing that. I just want to reaffirm that, that we're working off the existing record.

THE COURT: Yes.

MR. LERACH: Thank you.

MR. SNIDER: Neither side will then supplement the record; is that correct, your Honor?

THE COURT: Well—

MR. SNIDER: The reason I say it's very important, when the submission was made on January 4th, one of the reasons the submission was made to have it treated that way, as a Motion for Summary Judgment. We recessed and we conferred with one another, your Honor will recall, and we came back because we knew what facts were in the record on the issue of voluntariness. And there was a complete void of facts on that record from our point of view with respect to Mesa's position as to either May 20th or July 3rd.

On February 9, 1990, counsel for Mesa Petroleum Company filed a document entitled "Supplemental Motion for Summary Judgment." Mesa Petroleum Company also submitted a proposed order entitled "Supplemental Summary Judgment and Dismissal of Action With Prejudice."

On April 10, 1990, the district court entered a new judgment and vacated the January 19, 1990, order. The court ruled that "[a]lthough Mesa's tender of its Unocal stock in exchange for debt securities can be considered a 'sale', the Court finds that the *Kern County* unorthodox transaction exception applies to the May 1985 exchange offer to exempt it from Section 16(b) liability." The district court again entered an order that granted the Mesa Defendants' motion for summary judgment and denied Unocal's cross motion for summary judgment.

Unocal has timely appealed from the judgment which finally disposes of this section 16(b) action.

## DISCUSSION

I. *Nature of the Proceedings Before the Trial Court*

█ Unocal contends that the district court violated its right to trial by jury by weighing the evidence submitted by the parties, drawing inferences from conflicting circumstantial evidence, resolving disputed issues of fact, and determining the credibility of T. Boone Pickens' testimony, in ruling on cross motions for a summary judgment. The Mesa Defendants do not dispute Unocal's argument that the district court failed to consider the evidence in the light most favorable to Unocal in ruling on the motion for a summary judgment. Instead, the Mesa Defendants contend that the district court conducted a bench trial,

not a hearing on cross motions for summary judgment. The Mesa Defendants argue that we must review the district court's judgment under the clearly erroneous standard.

The record does not support the Mesa Defendants' contention that the parties "authorized the court to conduct a bench trial." Appellees' Brief at 14. The Mesa Defendants requested that the district court reconsider their motion for a summary judgment rather than act on Unocal's motion in limine. The Mesa Defendants prepared a proposed order granting their motion for a summary judgment and dismissing Unocal's action with prejudice.

The Mesa Defendants' reliance on *Wolfe v. United States*, 798 F.2d 1241 (9th Cir.), *amended on other grounds*, 806 F.2d 1410 (9th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 697 (1987), is misplaced. In *Wolfe*, we concluded, after reviewing the record, that "the parties intended to submit the case for a bench trial on stipulated facts." *Id.* at 1243–44 n. 2. The other cases relied upon by the Mesa Defendants also involve facts showing that the parties intended to waive trial by jury and try their cases on stipulated or agreed facts. *Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir.1975); *Southwest Forest Indus., Inc. v. Westinghouse Elec. Corp.*, 422 F.2d 1013, 1016–17 (9th Cir.), *cert. denied*, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); *Gillespie v. Norris*, 231 F.2d 881, 883 (9th Cir.1956).

Unlike the situation in the cases relied upon by the Mesa Defendants, in the instant matter the parties expressly agreed to have the court decide the applicability of the "unorthodox transaction" defense on cross motions for summary judgment. The court reflected this mutual understanding by stating: "It's now stipulated to be a motion, a cross summary judgment motion."

On the same date that the "unorthodox transaction" defense issue was submitted to the court for decision without oral argument on the cross motions for summary judgment, the record reflects that the court inquired of counsel about the "timing for trial." The court stated that "[t]here is a distinct possibility that I can start this case on January 30th." After some discussion, the trial date was set for January 30, 1985. Mr. Diamond, an attorney for Mesa Petroleum Company, then inquired of the court how counsel should respond "on the question of our desires on the jury/non-jury issue?" The court replied: "Make up your mind and let me know." Another of Mesa Petroleum Company's attorneys, Mr. James Edward Maloney, whose law office is in Texas, then asked the court whether the trial judge conducts the voir dire in the Central District of California. Thereafter, Mr. Maloney's request to be allowed to question the prospective jurors on voir dire was granted.

In light of the state of the record in this matter, which shows that the Mesa Defendants requested that the court determine the applicability of the "unorthodox transaction" defense on summary judgment rather than in a non-reviewable motion in limine proceeding, and sought permission to participate in the voir dire examination of the jurors, if they decided not to waive a trial by jury, we are troubled that they now argue that the record shows that the parties agreed to a bench trial. This type of overzealous advocacy burdens the court with a frivolous argument and does little to guide us in our efforts to reach a just result.

Because the record demonstrates that the district court decided the applicability of the "unorthodox transaction" defense in response to the Mesa Defendants request that the denial of its motion for a summary judgment be reconsidered, we must reject their contention that we should review the judgment for clear error.

We review an order granting summary judgment *de novo*. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). Thus, we are required to review all the evidence presented to the district court in the light most favorable to the non-moving party. *Id.* We must also make an independent, non-deferential, determination concerning the question whether the district court correctly applied the law. *Id.* Because our re-

view is independent, any error committed by the district court in weighing the evidence, drawing inferences from disputed facts, and in determining credibility in this matter was harmless.

## II. Applicability of the "Unorthodox Transaction" Defense Under These Facts

█ Unocal argues that the district court erred in concluding that the "unorthodox transaction" defense to an action for disgorgement of short-swing profits by a beneficial owner is applicable if the facts in the record in this matter are viewed in the light most favorable to the Mesa Defendants. Unocal asks this court to direct the entry of a summary judgment in its favor on the ground that the exchange of the Mesa Defendants' common stock for negotiable debt securities was a "sale" within section 16(b). Unocal asserts that the "unorthodox transaction" defense to an action brought pursuant to section 16(b) is not applicable to a self-tender offer in which a beneficial owner exchanges his common stock for negotiable debt securities issued as a result of a recapitalization of the issuer.

Section 16(b) of the Securities Exchange Act of 1934 provides that an issuer may recover any profits realized by a beneficial owner from the sale of the issuer's equity securities within a six-month period.[5] A beneficial owner is a shareholder who owns, directly or indirectly, more than ten percent of any class of equity security. 15 U.S.C. § 78p(a) (1988).

One goal of the Securities and Exchange Act of 1934 is to " 'insure the maintenance of fair and honest markets.' " *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591, 93 S.Ct. 1736, 1743, 36 L.Ed.2d 503 (1973) (quoting 15 U.S.C. § 78b). In adopting section 16(b), Congress intended "to curb manipulative

and unethical practices resulting from misuse of corporate information for personal enrichment or unfair profit of the insider, thereby assuring the strict observance of the insider's fiduciary duties to outside shareholders and the corporation by removing the profit from short-swing dealing in corporate securities." *Oliff v. Exchange Int'l Corp.*, 669 F.2d 1162, 1165 (7th Cir. 1980), *cert. denied*, 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981).

In order to achieve these goals, Congress adopted "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). " 'The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation.' " *Id.* (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971)).

Section 16(b) has been referred to as a "crude rule of thumb." *Kern County Land Co.*, 411 U.S. 582, 592–93 n. 23, 93 S.Ct. 1736, 1743–44 n. 23, 36 L.Ed.2d 503 (1973) (quoting *Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency*, 73d Cong., 2d Sess., pt. 15, at 6557 (1934)). We have described the application of section 16(b)'s bright-line rule as "mechanical," *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1282 (9th Cir.1982), and "automatic," *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 522 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). Where a transaction involving an equity security falls within the objective standards established by Congress for section 16(b), liability attaches. *Id.*

---

**5.** Section 16(b) provides in pertinent part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity

security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction.

15 U.S.C. § 78p(b) (1988).

The Securities Exchange Act of 1934 broadly defines "sale" as "any contract to sell or otherwise dispose of" any security. 15 U.S.C. § 78c(a)(14) (1988). A "sale" has been deemed to occur "when an insider becomes irrevocably *entitled* to receive a sum certain for his security," *Seinfeld v. Hospital Corp. of Am.*, 685 F.Supp. 1057, 1062 n. 5 (N.D.Ill.1988) (emphasis in original), or when "the insider has incurred an 'irrevocable liability' to dispose of the stock so that his 'rights and obligations' have become fixed," *Lewis v. Bradley*, 599 F.Supp. 327, 330 (S.D.N.Y.1984).

The district court concluded that "[a]lthough Mesa's tender of its Unocal stock in exchange for debt securities can be considered a 'sale', the Court finds that the *Kern County* unorthodox transaction exception applies to the May 1985 exchange offer to exempt it from Section 16(b) liability."

The Mesa Defendants conceded, at oral argument, that their exchange of Unocal equity stock for debt securities pursuant to Unocal's self-tender offer was a "sale" if section 16(b) is given a literal interpretation.[6] The Mesa Defendants contend that their exchange of stock for non-convertible debt securities on May 20, 1985, falls within the "unorthodox transaction" defense to section 16(b) liability established by the Supreme Court in *Kern County*.

In *Kern County*, the Supreme Court addressed the following fact-specific question: "[I]s it a § 16(b) 'sale' when the target of [a] tender offer defends itself by merging into a third company and the tender offeror then exchanges his stock for the stock of the surviving company and also grants an option to purchase the latter stock that is not exercisable within the statutory six-month period?" 411 U.S. at 584, 93 S.Ct. at 1739.

In *Kern County*, Occidental Petroleum Corporation announced a tender offer to purchase 500,000 shares of Kern County Land Company (Kern County) common stock. The tender offer was expressly due to expire on June 8, 1967. *Id.* Kern County opposed Occidental's takeover attempt and, on May 19, 1967, announced the Board of Directors' approval of a "defensive" merger with Tenneco, Inc. *Id.* at 585–86, 93 S.Ct. at 1739–40. Pursuant to the merger, the Kern County shareholders would receive one share of Tenneco cumulative convertible preference stock for each share of Kern County common stock. *Id.*

The Kern County shareholders approved the merger with Tenneco on July 17, 1967. *Id.* at 588, 93 S.Ct. at 1741. Occidental issued a statement that it had decided not to oppose the merger, but it refrained from voting its shares in favor of the merger. *Id.* The merger between Kern County and Tenneco became effective on August 30, 1967, within six months from the expiration date of the Occidental tender offer. *Id.* at 589, 93 S.Ct. at 1742. On this date, all Kern County shareholders became irrevocably entitled to receive one share of Tenneco preference stock in exchange for each share of Kern County stock. *Id.* Occidental realized a $19,506,419.22 profit on the Kern County shares it acquired through its tender offer. *Id.* at 589–90, 93 S.Ct. at 1741–42.

The new Kern County Land Company that was formed as a result of the merger, filed an action against Occidental under section 16(b) to recover the profits from the sale. *Id.* at 590, 93 S.Ct. at 1742. The district court held that the automatic exchange of shares on August 30, 1967, constituted a "sale" within the meaning of section 16(b). *Id.* The Second Circuit reversed, holding that the automatic exchange of shares pursuant to the merger did not constitute a "sale" for section 16(b) purposes. *Id.* at 590–91, 93 S.Ct. at 1742–43. The Supreme Court granted certiorari. *Id.* at 591, 93 S.Ct. at 1743.

In determining whether the exchange of stock pursuant to the merger between Kern County and Tenneco was a "sale"

---

**6.** During oral argument, the court questioned whether the exchange transaction would fit within the broad definition of "sale," as that term is used in section 16(b). Counsel for the Mesa Defendants responded: "Yes, your honor, were it not for the [unorthodox transaction] exemption, it would."

giving rise to section 16(b) liability, the Supreme Court first recognized that the statute imposed a " 'flat rule.' " *Id.* at 592, 93 S.Ct. at 1743 (quoting *Reliance Elec. Co.*, 404 U.S. at 422, 92 S.Ct. at 599). The Court then noted that

> [a]lthough traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of § 16(b), the courts have wrestled with the question of inclusion or exclusion of certain "unorthodox" transactions.... In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information—thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.

*Id.* 411 U.S. at 593–95, 93 S.Ct. at 1744–45 (footnotes omitted).[7]

The Court held that the exchange of Kern County stock for Tenneco stock on August 30, 1967, was not a "sale" within the scope of section 16(b). *Id.* at 596, 93 S.Ct. at 1745. The Court concluded that "the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16(b) should not apply to transactions such as this one." *Id.* at 600, 93 S.Ct. at 1747. In reaching this conclusion, the Court characterized as "critical" the fact that the exchange was required pursuant to the merger between Kern County and Tenneco. *Id.* at 599, 93 S.Ct. at 1747. "Once the merger and exchange were approved, Occidental was left with no real choice with respect to the future of its shares of Old Kern." *Id.* at 600, 93 S.Ct. at 1747.

The exchange of Unocal stock for debt securities pursuant to Unocal's tender offer is factually distinguishable from the transaction in *Kern County.* The exchange of Occidental's stock for equity shares of the new corporation which was formed as the result of the merger in *Kern County* was involuntary and automatic. The May 20, 1985, exchange of stock for debt securities by the Mesa Defendants was not an involuntary or automatic transaction. Unocal did not merge into a new corporation so as to compel its shareholders to exchange their stock.

The Mesa Defendants not only were not compelled to exchange their stock for Unocal's debt securities, but Unocal expressly excluded them from its self-tender offer. The Mesa Defendants filed a suit in Delaware seeking an injunction to force Unocal to permit the Mesa Defendants to participate in Unocal's tender offer.

The Mesa Defendants had the choice of participating in the tender offer or holding onto their stock. The record shows that it was anticipated that Unocal's stock would sell at $30 a share as a result of the exchange set forth in the tender offer. One of the choices available to the Mesa Defendants was to buy up Unocal's stock at the reduced price of $30 a share and acquire control of the corporation. Once in control of Unocal, the Mesa Defendants would have the option of selling off Unocal's assets and thereby recouping any of their losses in the value of the stock purchased prior to the self-tender offer.

The evidence is undisputed that the Mesa Defendants initiated negotiations with Unocal, seeking participation in the self-tender offer. In the book, *Boone,* which is part of the record in this matter, T. Boone Pickens states that one of his attorneys told Unocal representatives that "[Mesa] would have to be included in their tender offer or take action to protect [them]selves." T. Pickens, *Boone* 282 (1987). The parties dealt at arms length in the negotiations that fol-

7. Courts have referred to *Kern County*'s approach to determining section 16(b) liability in unorthodox transactions as a "pragmatic" approach, *Provident Sec. Co. v. Foremost–McKesson, Inc.*, 506 F.2d 601, 604 (9th Cir.1974), *aff'd* on other grounds, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), in contrast to the "objective" approach of imposing liability in transactions which are clearly within the ambit of section 16(b).

lowed. Unocal was concerned that if the Mesa Defendants were excluded, they might buy up the devalued shares at a bargain price and seize control of the corporation. Mr. Pickens describes the stakes for each side in the negotiations following the Delaware Supreme Court's decision in favor of Unocal as follows:

> This meant that Hartley didn't have to offer Mesa anything. He could buy back the stock from all the shareholders but us, decreasing the value of the remaining Unocal stock. If Unocal bought back 70 million shares at $72, that left 100 million shares that would be worth a lot less, including all of the Mesa Partners holdings, which would drop to around $30 a share after the buyback. Our stock would then be worth less than $700 million—a loss of about $300 million.
>
> This new ruling was unprecedented, but there was no use crying about it. We had a choice: we could make a deal with Unocal, or after they concluded their tender offer we could make a 100 percent all-cash offer for the company. We got a call from Drexel asking us not to fold. They had raised $3 billion and were ready to raise the additional funds for us to make a 100 percent offer. It was an unqualified endorsement of Mesa, and it naturally gave us a lift.
>
> It would be a great campaign, no doubt about it, but the risks were getting very high. It wasn't time to get emotionally involved. It hadn't been a year since we had gotten out of a $300 million jam, so I wasn't ready to step up to the table and put everything on 7 and call for the dice. It might work—but it might not. If Mesa went all out for Unocal, Hartley would probably pull the same exclusionary self-tender the second time, and then we would be back in the Delaware court. We had been nailed once, and that was one time too many.
>
> We could force Fred to take on even more debt, and he was gagging now. But there was no guarantee we would win.

*Id.* at 281.

In a subsequent passage, Mr. Pickens stated:

> Stillwell got a call from Los Angeles on Sunday afternoon. Hartley was ready to talk. He would agree to Mesa's demands but had one of his own. He wanted us to pay Unocal's expenses—a silly request but a big point to Hartley. If he could get us to pay his expenses, he would never let us forget it. We still had our tax treatment "ace" up our sleeve. If we were included in Unocal's offer and held the remainder of our stock for a year, we would make around $80 million after taxes. The trick was to keep Unocal from figuring it out.

*Id.* at 282.

Mr. Pickens describes the effect of the negotiations on Unocal and the Mesa Defendants as follows:

> Our team signed the deal and flew home on Monday night. The Mesa–Unocal deal was history. Hartley was soon crowing that he had defeated Pickens and tied up Mesa for a year because we had to hold their stock. He claimed we had lost $100 million. It was just the opposite. We were going to make money, but we couldn't announce it until our auditors, Arthur Anderson, had signed off. We also wanted to receive the proceeds from Unocal before announcing any profit. That meant waiting sixty days or so, but we just didn't trust them.
>
> I could barely keep quiet as I read Hartley's claims of having 'beaten' Mesa. Then, two months later, the Unocal bonds in hand, we enjoyed the last laugh—$83 million profit after taxes, twice what we had made in the Phillips deal.
>
> When you have to explain a victory, it becomes something less. Gradually the financial community, the press, and the academicians came to understand what we had done.

*Id.* at 284.

Unlike the plight of the hapless beneficial owner in *Kern County*, the record conclusively shows that the Mesa Defendants voluntarily exchanged their common stock for negotiable debt securities. The exchange in the matter *sub judice* was not

the inexorable consequence of corporate machinations that forced the stockholders to exchange their shares as the result of the dissolution of the corporation. Here, the beneficial owners controlled their own destiny and skillfully negotiated a result that Mr. Pickens characterized as a victory for his side.

Courts following *Kern County* have recognized that involuntariness is an important factor in determining whether or not a transaction constitutes a "sale" or "purchase" within section 16(b). In *Provident Sec. Co. v. Foremost–McKesson, Inc.*, 506 F.2d 601 (9th Cir.1974), *aff'd on other grounds*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), we stated that "[a]bsent a showing of involuntariness, we would not be justified in applying the *Kern County* rule." *Id.* at 606. *See also Texas Int'l Airlines v. National Airlines, Inc.*, 714 F.2d 533, 540 (5th Cir.1983) ("[T]he volitional character of the exchange is sufficient reason to trigger applicability of the language of section 16(b)."), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984); *Gund v. First Florida Banks, Inc.*, 726 F.2d 682, 686 (11th Cir.1984) ("The vast majority of cases in which the pragmatic approach has been followed involve involuntary transactions which are triggered by a corporate reorganization....").

The Mesa Defendants argue that "otherwise volitional transactions" are unorthodox under section 16(b) if a beneficial owner is coerced economically into exchanging his common stock or suffer a financial loss. In *Oliff v. Exchange Int'l Corp.*, 669 F.2d 1162 (7th Cir.1980), *cert. denied*, 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981), the Seventh Circuit found that although a 205% tax payment was not a "reasonable alternative" to the repurchase of shares which gave rise to section 16(b) liability, the acquisition of the stock was not "so involuntary as to take it out of the definition of 'purchase' for 16(b) purposes." *Id.* at 1168. In *Tyco Laboratories, Inc. v. Cutler–Hammer, Inc.*, 490 F.Supp. 1 (S.D.N.Y.1980), the court rejected the argument that section 16(b) should not apply because the sale of stock was coerced. The court stated that

[a]lthough plaintiffs had the option to maintain their ownership interest in C–H stock, they chose not to exercise that option. The fact that plaintiffs may have found it to be more financially advantageous to sell their C–H stock on June 12, 1978 than at a later time cannot be a basis for characterizing the sale transaction as involuntary.

*Id.* at 8.

An economic coercion test would allow corporate insiders to avoid section 16(b) liability by presenting evidence of a variety of unfortunate circumstances that forced them to sell their common stock. The objective standards of section 16(b) were adopted to avoid the necessity for an inquiry into an insider's subjective "intent." *Reliance Elec. Co.*, 404 U.S. at 422, 92 S.Ct. at 599 (quoting *Bershad*, 428 F.2d at 696). We reject the "economic coercion" test as contrary to the intent of Congress in enacting the bright-line, flat rule set forth in section 16(b) requiring disgorgement of profits.

We conclude that the facts in this matter do not come within the holding of *Kern County* that an involuntary transaction that results from a merger is "unorthodox."

The cases that have applied the *Kern County* "unorthodox transaction" defense to a short-swing sale by a beneficial owner have characterized it as a narrow exception to section 16(b). *See, e.g., Texas Int'l Airlines*, 714 F.2d at 539 ("In *Kern County* the Supreme Court approved an extremely narrow exception to the objective standard of section 16(b)."). The Supreme Court did not indicate that the courts should conduct an ad hoc, case-by-case analysis of all securities transactions involving a sale by a beneficial owner. The Court in *Kern County* simply held that an automatic exchange of stock in one company for stock in another company pursuant to a merger between the two companies, over which the shareholder had no control, is not a form of transaction covered by section 16(b). 411 U.S. at 600, 93 S.Ct. at 1747.

The majority of the transactions which have been considered "unorthodox" within the narrow exception announced in *Kern County* involve exchanges of stock pursuant to a merger. *See, e.g., Heublein, Inc. v. General Cinema Corp.*, 722 F.2d 29, 31 (2d Cir.1983) (section 16(b) is not intended to apply to an involuntary exchange of shares resulting from a merger), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984); *American Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1053 (2d Cir.1974) (*Kern County* applies to a defensive merger where the beneficial owner tries to defeat it), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975); *Gold v. Sloan*, 486 F.2d 340, 344 (4th Cir. 1973) (exchange of shares pursuant to a merger may not constitute a purchase under section 16(b)), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *National Westminster Bancorp v. Leone*, 702 F.Supp. 1132, 1138 (D.N.J.1988) (merger is an "unorthodox transaction" requiring an examination of the goals of section 16(b)); *Colan v. Prudential–Bache Secs., Inc.*, 577 F.Supp. 1074, 1081 (N.D.Ill.1983) ("forced exchange of securities pursuant to a merger" is not a sale within section 16(b)).

Those courts that have directly addressed the issue of section 16(b) liability in a tender offer or hostile takeover context have concluded that the disposition of shares pursuant to a tender offer, or in the face of defeat in a takeover contest, is not an "unorthodox transaction" under *Kern County*. In *Super Stores, Inc. v. Reiner*, 737 F.2d 962 (11th Cir.1984), the Eleventh Circuit held that *Kern County* did not create an exception from the short-swing profit prohibitions of section 16(b) for a transaction in which "a corporate officer and director facing defeat in a tender offer battle voluntarily tendered his stock to his opponents for cash." *Id.* at 965. In *T–Bar, Inc. v. Chatterjee*, 693 F.Supp. 1 (S.D.N.Y.1988), a defeated tender offeror converted debentures into common stock of the target corporation and tendered those shares into a competing cash tender offer for 70% of the target's stock. *Id.* at 4. The court held that this transaction was not the form of transaction held to be "unorthodox" in *Kern County*. *Id.* at 5. Instead, the court stated that "[u]nlike the defendant in *Kern County*, Beall made a business decision to tender its shares into the Data Switch offer." *Id.*

In a hostile takeover situation, the Fifth Circuit held that *Kern County* did not apply to a transaction in which a defeated tender offeror sold its shares in the target corporation to a company with which the target had entered into a merger agreement. *Texas Int'l Airlines*, 714 F.2d at 540. In *Tyco Laboratories*, the court rejected a claim that the existence of a "control contest type of situation" renders the sale of stock to a third party "unorthodox" within the meaning of *Kern County*. 490 F.Supp. at 6. In *Lane Bryant, Inc. v. Hatleigh Corp.*, 517 F.Supp. 1196 (S.D.N.Y.1981), a ten-percent shareholder facing opposition to its intended proxy contest sold all of its stock to the corporation for a premium. *Id.* at 1197–98. The court found that *Kern County*'s pragmatic test for "unorthodox transactions" was inapplicable, ruling instead that

> the objective test [of § 16(b)] should clearly apply to the instant case since the defendant here both purchased and sold plaintiff's stock for cash and, while there was a contest for control, this case differs from Kern County and American Standard, where the target merged with a third corporation, causing the defendant tender offeror to become a minority shareholder in the third corporation, in that here there was no defensive merger, but rather the defendant simply decided it was unprofitable to pursue the proxy contest.

*Id.* at 1200.

Mesa cites only one case, *Pier 1 Imports of Georgia, Inc. v. Wilson*, 529 F.Supp. 239 (N.D.Tex.1981), in which a tender offer was determined to be an "unorthodox transaction" for section 16(b) purposes. In *Pier 1 Imports*, the court stated that "a tender offer has been found to fall within the unorthodox transaction rubric rather than a 'garden variety' Section 16(b) claim." *Id.* at 242–43. The district court in *Pier 1*

*Imports* cited *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 637 (S.D.N.Y.1974), and *Securities and Exchange Commission v. Texas Int'l Co.*, 498 F.Supp. 1231, 1239 (N.D.Ill.1980), for this proposition. *Pier 1 Imports*, 529 F.Supp. at 242–43. *Makofsky* and *Texas Int'l* do not support the district court's holding in *Pier 1 Imports*.

*Makofsky* does not involve a tender offer. It involves a section 16(b) action seeking recovery of profits realized by an insider through the purchases and sales of option shares. *Makofsky*, 383 F.Supp. at 636. The court held that section 16(b) was applicable. *Id.* at 643. The language in *Makofsky*, upon which *Pier 1 Imports* relies, stating that "tender offers ... are not suited to mechanical application of the statute," is dictum and is based on pre-*Kern County* cases, none of which involve an exchange of stock pursuant to a tender offer. *Id.* at 637.

In *Texas Int'l*, the district court had before it a claim filed by the SEC pursuant to section 14(b) of the Williams Act. The applicability of section 16(b) was not an issue in *Texas Int'l*. Section 16(b) was referred to in a parenthetical explanation of *Kern County*'s application of the "unorthodox transaction" in deciding whether to apply section 16(b). 498 F.Supp. at 1239.

We agree with the Eleventh Circuit in *Super Stores*, and the district court in *T-Bar Inc.*, that the sale or purchase of stock pursuant to a tender offer is not an "unorthodox transaction."

The Mesa Defendants assert that the exchange of their common stock for debt securities was an "unorthodox transaction" because it resulted from a recapitalization of Unocal. The Mesa Defendants rely primarily on the Supreme Court's comment in footnote 24 in *Kern County* to support this proposition. 411 U.S. at 593 n. 24, 93 S.Ct. at 1744 n. 24. In footnote 24, the Court observed that "[t]he term [unorthodox transaction] ... has been applied to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants." *Id.* The

Mesa Defendants reason that since a recapitalization is a form of corporate reorganization, it must constitute an "unorthodox transaction."

The comment in footnote 24 in *Kern County* was not necessary to the opinion in *Kern County*. *Kern County* did not involve recapitalization. The Court, without expressing its approval, enumerated the types of business transactions that others have labeled as "unorthodox." The Court did not cite any authority to support its observation in footnote 24. Thus, we cannot determine whether the Court was referring to decisions construing section 16(b).

The Mesa Defendants rely on two district court decisions published solely in the Federal Securities Law Reporter to support their view that a corporate recapitalization is an "unorthodox transaction." Neither supports their position. In *Rothenberg v. United Brands Co.*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,045 (S.D.N.Y. May 11, 1977), *aff'd without opinion*, 573 F.2d 1295 (2d Cir.1977), the district court concluded that no violation of section 16(b) occurred because the record showed that "[w]hen United exchanged or converted these common shares into Class A, the total amount of its investment in Foster did not change." *Id.* at 91,694. The court concluded that this exchange did not involve a new investment. *Id.* The court held that "[i]t would appear that to be a sale under § 16(b), there must be some change in either the character of the investment or the nature of the market risk assumed." *Id.*

In *Hayes v. Sampson*, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,693 (S.D.N.Y. Nov. 18, 1980), the district court, relying on *Rothenberg*, held that no sale within section 16(b) occurred where the directors of a corporation exchanged old debentures for new debentures because "neither the amount invested nor the percentage of ownership of this class of security changed within the six month period relevant under Section 16(b)." *Id.* at 98,644. If anything, *Rothenberg* and *Hayes* stand for the proposition that a recapitalization which results in a change in the nature of

a beneficial owner's investment and market risk is a sale within section 16(b).

In the instant matter, the nature of the Mesa Defendants' investment was changed. They exchanged common stock for negotiable debt securities with a higher market value. The Mesa Defendants' market risk also changed from that of an equity owner of shares in a corporation, subject to market fluctuations, to a holder of negotiable debt securities which obligated Unocal to pay a fixed sum at a certain maturity date together with periodic interest payments.

## CONCLUSION

The evidence is undisputed that the Mesa Defendants made a voluntary business decision to persuade Unocal to permit them to participate in the corporation's self-tender offer. As a result, the Mesa Defendants exchanged common stock, whose value was subject to the risks of a free market, for negotiable debt securities of a higher current value with fixed payments and interest rates. The record also shows that the Mesa Defendants shrewdly calculated their options, which included a complete buy out of all of Unocal's stock or acceptance of the self-tender offer because of undisclosed tax advantages. We conclude that the exchange of the Mesa Defendants stock for Unocal's negotiable debt securities was a sale within section 16(b). Because of our determination that this exchange was not an "unorthodox transaction," we do not review the record to determine whether the Mesa Defendants had the opportunity to engage in the speculative abuse of inside information.

The order granting summary judgment in favor of the Mesa Defendants is REVERSED. The order denying Unocal's cross motion for a summary judgment is REVERSED with directions to enter an order granting Unocal's motion for a summary judgment.